STATE v. DURHAM.

(Filed March 6, 1906). ·

*Homicide—Self-Defense—Resisting Arrest—Manslaughter.*

1. Where deceased, a deputy sheriff, had arrested the prisoner upon a warrant for a misdemeanor, and while he was writing the bond, the prisoner escaped and deceased following to capture him, with pistol in hand, fired at the prisoner and in the altercation the prisoner shot and killed deceased, an instruction that the prisoner was at least guilty of manslaughter, was correct.

2. The law of self-defense applicable to encounters between private persons does not arise in the case in which a person sought to be arrested kills the officer seeking to make the arrest.

WALKER and CONNOR, JJ., dissenting. .

INDICTMENT for murder against Frail Durham, heard by *Judge W. B. Councill* and a jury, at the August Term, 1905, of the Superior Court of POLK. The defendant was convicted of murder in the second degree, and from the sentence of the court pronounced thereon, appealed.

*Robert D. Gilmer, Attorney-General,* for the State.
*Smith & Schenck* and *A. H. Dean* for the defendant.

BROWN, J.  The evidence tends to show that the deceased was a deputy sheriff and had a warrant for the arrest of the prisoner for carrying concealed weapons.  Deceased approached prisoner for the purpose of effecting his arrest, and some conversation ensued, the prisoner finally agreeing to give bond for his appearance.  The prisoner, the deceased and others started to the office in the feed store of one Engel for the purpose of signing the bond. ·Hilton, the deputy sheriff, sat down at the table to write the bond, and while thus engaged the prisoner escaped from the room, Hilton following to capture the prisoner, and in the altercation which followed, the prisoner shot and killed Hilton.

In one of their briefs the prisoner's counsel admit that if the decision in *State v. Horner,* 139 N..C., 603, is to be adhered to, all their exceptions are untenable except the fourth; and as to that exception it is insisted that the court below erred in charging the jury that in any view of the evidence the defendant was guilty of manslaughter, thereby depriving him of his plea of self-defense.  In the able argument of Mr. Dean, as well as in their well considered briefs, counsel for defendant endeavored to draw a distinction between the case at bar and *Horner's case.*  After most careful consideration, we fail to see the distinction.  In fact the cases appear to be "on all fours."

· The deceased Hilton was a deputy sheriff and had arrested the prisoner upon a warrant for carrying a concealed weapon —a misdemeanor.  The defendant, according to his own evidence, recognized Hilton's authority and went with him to give bond for his appearance.  When they arrived at the office the deceased commenced to write the bond.  As to subsequent occurrences the defendant testified: "Hilton then sat down and got to writing, and while he was doing so, I slipped out of the side door of the store, and after I had got about twenty yards, I looked back and saw Hilton coming with his pistol in his hand, coming towards me.  I was run-

ning and he was running. I ran on about five or ten steps and looked around and saw Hilton with his pistol pointing towards me. Up to this time I had not drawn my pistol. I then drew my pistol and continued to go forward sideways, holding my pistol pointing in the direction of the left side (describes attitude). The range of the pistol was not on Hilton. I looked around as I was going away, and as I did so he fired on me. I then turned and fired. I did not aim at him this shot. I did not attempt to hit him. I did not want to hit him this shot. When I fired the first shot I came to a little stop—a moment's stop. I then went two or three steps and Hilton shot again and the bullet glazed me on the left arm. I then fell back a little bit—standing against a little sapling. Up to this time Hilton had fired two shots and I one, and after this he fired two more before I fired any more. I then fired one and killed him. At the time I fired the last shot, Hilton was standing up aside of a sapling, his pistol pointing at me. After the last shot I ran off and went home."

The defendant further testified that when Hilton arrested him he laid hands on the defendant and said, "Give me your gun;" that he had a pistol in his pocket and did not give it up or allow Hilton to search him; that he had a bottle of liquor in his right hip pocket; that he fired on Hilton and killed him because he thought Hilton would kill him, and that Hilton ordered him to stop as he ran off." One Kuy Kendall corroborates the defendant, but states that he never saw the defendant when he drew the pistol, and never saw it until the defendant turned and fired. This is not necessarily inconsistent with the defendant's statement.

We have stated only the material evidence offered by the defendant and most favorable to him, because in passing on this exception that testimony alone should be considered. The facts in *Horner's case,* briefly stated, are that Nichols, a deputy sheriff, had a warrant for Horner for a misde-

meanor, viz., whipping his daughter-in-law. Horner refused to submit to arrest and attempted to escape. The testimony most favorable to Horner was his own (139 N. C., p. 610): "I was in the woods; dog had treed a squirrel; Nichols and Breez came on down the road. Nichols called to me and I answered. He said 'come on and go with me;' had a warrant; he read it. I said I am not going to do it; he said if I would promise to be at Squire Terry's tomorrow at three o'clock, he would go. I refused. He came on me and said to me with an oath, 'If you do not go with me I am going to shoot you.' Then I picked up gun and walked off; he shot at me; I ran *about 50 yards;* he shot again and I threw gun 'round and shot; I was going away from him; was out there for a squirrel. I ran against a tree when he was after me—knew deceased was a deputy sheriff." Horner was convicted of murder in the second degree and appealed. His Honor had instructed the jury, as in the case at bar, that Horner was guilty of manslaughter at least. In almost every respect the cases are similar.

Ever since *Garrett's case,* 60 N. C., 145, it has been thought that in this State the principle of self-defense does not apply to the case of one who places himself in the posture of armed defiance to the process of the State. In that case the great *Chief Justice* says: "When a man puts himself in a state of resistance and openly defies the officers of the law, he is not allowed to take advantage of his own wrong, if his life is thereby endangered, and to set up the excuse of self-defense." The law of self-defense, applicable to encounters between private persons, does not arise in the case in which a person sought to be arrested kills the officer seeking to make the arrest. In this State, we think this is most essential to "preserving good order and asserting the supremacy of the law." After mature consideration this rule was reaffirmed in *Horner's case* by a unanimous court. The well considered opinion delivered by *Mr. Justice Connor* is not

STATE *v.* DURHAM.

open to any possible misconstruction so far as we can see. Much of his language would apply with aptness to this case. The learned *Justice* says: "The prisoner knew that the deceased was a deputy sheriff and that he had a warrant for his arrest. It was his duty to submit to arrest, and in resisting it with a gun in his hand it is not open to him to say that he acted in self-defense. Conceding that as he (the prisoner) was going away from the officer, refusing to submit to arrest, the officer was not justified in shooting him to make the ar rest, does not affect his right to kill. If there was a necessity to shoot the deceased to save his life, it was the result of his unlawful act in resisting the mandate of the law. The position of the prisoner is similar in this respect to one who brings on or provokes a difficulty, and in the progress of it kills. It is not *se defendendo,* because he brought on the necessity. This is elementary and uniformly sustained by numerous cases in our own and other jurisdictions."

The officer is not excused if he, with undue violence, menaces the life of the defendant when he attempts to arrest a person for a misdemeanor. The officer may be convicted and punished. But his crime will not excuse or condone the crime of the defendant in making open resistance to the process of the State. We are aware that in some jurisdictions it is held otherwise, and that while an officer in attempting to arrest for a misdemeanor, dangerously menaces the life of the accused, the latter may defend himself to the extent of taking the officer's life and the plea of self-defense is open to him. But in this State we have a statute (Acts 1889, chap. 51,) which enacts that "any person who wilfully and unlawfully resists, delays or obstructs a public officer in discharging or attempting to discharge a duty of his office, shall be guilty of a misdemeanor." At the time he killed the deceased, the defendant was engaged in an unlawful act, not only *malum in se* (being in armed resistance to the process of the State), but an act directly connected with and which

finally resulted in the death of the officer; for it is plain that had the defendant himself not resisted the law, but submitted to arrest, there would have been no homicide by any one. *State v. Hall,* 132 N. C., 1094; *Turnage's case,* 138 N. C., 566; Wharton Cr. Law, vol. 1 (10 Ed.), sec. 305. There is .

No Error.


WALKER, J., dissenting: I am unable to concur with the majority of the court in the conclusion they have reached in this case. As the effect of the decision is to deprive the citizen of the important right of self-defense when upon the plainest principles of law he is justly entitled to it, I deem it but right that my views should be stated somewhat at length, supported, as I think they are, by the highest and weightiest authority. In order to understand the precise question presented, it will be necessary to summarize the facts, for they are not stated in the opinion of the court, as I understand them.

The defendant was indicted in the Superior Court of Polk County, at Fall Term, 1905, for the murder of L. C. Hilton, at Tryon, on the 26th of March, 1905. The trial resulted in a verdict of murder in the second degree, and the defendant was sentenced to fourteen years' imprisonment. The facts and circumstances connected with the killing are practically undisputed, and are as follows: The deceased was a deputy sheriff of Polk County, and held a warrant for the arrest of defendant for carrying concealed weapons. On Sunday, March 26, 1905, defendant was in Tryon and deceased attempted to arrest him; the deceased, the defendant and several others were in the back part of Shore and Engle's barn, discussing the matter of arrest and the giving of bond, the defendant at first demurring to the arrest upon the ground that the officer could not arrest him on Sunday; finally, upon the advice of his friends, the defendant yielded, and, in the

language of McFarland, the only eye witness, introduced by the State in chief, "then they, Frail and others, started on to the store to get the bond signed, *Frail deciding to give it."* One Engel had agreed to sign the defendant's bond, and this arrangement had been accepted by the deceased. The deceased was requested to sit down at the table and prepare the bond. While he was in the act of writing it, the defendant slipped out of the side door of the feed room; the deceased asked "Has he gone?" Some one answered, "Yes." Mr. Engel, who was to become surety on the defendant's bond, said to the deceased, "Never mind, let him go; I will sign the bond." The deceased made no reply, but bolted out of the door after Durham, with his hand on his pistol. After the defendant had gone about twenty yards he looked back and saw the deceased coming with his pistol in his hand; they were both running; the defendant ran five or ten steps, and looking around, saw the deceased with his pistol pointed towards him; the defendant then for the first time drew his pistol, continuing his retreat sideways, holding his pistol towards his left side, not on the deceased; the deceased fired; the defendant returned the fire, but not intending to hit; the deceased fired again, the shot grazing the defendant's left arm; defendant fell back a little, standing against a sapling; the deceased fired two more shots and was in the act of firing again, when defendant fired the shot that killed deceased. The defendant's last bullet grazed the knuckle of deceased's right hand and pierced his eye, showing that the deceased was then in the act of aiming and firing. Defendant testified that he fired at Hilton because he thought Hilton would kill him. Another witness had testified that he was present and saw what occurred. When Hilton went out, he drew his pistol, about ten feet from the door, then ran on about the distance of twenty-five steps from the door and held it up in his hands and fired at Durham. He held his pistol in both hands after taking it out. He did not see defendant draw his pistol until

he turned and fired at Hilton. He did not have his hand on his hip pocket as he ran off. Hilton fired three times and defendant twice.

The defendant requested the court to charge the jury as follows: "The law does not justify an officer in killing one accused of a misdemeanor, in order merely to stop his flight, and an attempt to do so by an officer would constitute an assault against which the person assaulted would have a right to defend himself." The court gave the instruction, omitting the words, "against which the person assaulted would have a right to defend himself," and added to the instruction, as thus stripped of its essential feature, the following: "That while this is true, yet where one resists lawful arrest, or having been arrested, flees, and the officer resorts to means to arrest or re-arrest which amounts to an assault, still the person so arrested or fleeing from arrest has no right to defend himself against such an assault, unless he satisfies the jury from the evidence that he no longer resists arrest, or has ceased to flee and yielded to arrest. This not appearing from the evidence, the defendant would at least be guilty of manslaughter in this case."

If, in any view of the case the defendant was entitled to have the plea of self-defense submitted to the jury, there was error. We understand this to be conceded. At any rate the right of the defendant to have it submitted is unquestionable.

The fallacy in the opinion of the court arises out of a total misconception of the distinction between resistance to arrest and resistance to a felonious assault. If the defendant resisted arrest, which he did not do, the deceased had the right to use so much force as was necessary to accomplish his arrest and compel submission to the mandate of the law. And right here, it is well to state that there is a wide difference between resistance to arrest and the mere avoidance of arrest by fleeing or running away from the officer. The latter is an escape. With this distinction clearly before us, let us pro-

STATE v. DURHAM.

ceed to examine the case. If there is anything settled as law by this court, it is that an officer has no right to endanger the life of one fleeing from him who is charged merely with the commission of a misdemeanor. "A very different principle prevails where a party charged with a misdemeanor flees from an officer, who is entrusted with a criminal warrant or capias, in order to avoid arrest. The accused is shielded in that event, even from an attempt to kill with a gun or pistol, by the merciful rule which forbids the risk of human life or the shedding of blood in order to bring to justice one who is charged with so trivial an offense, when it is probable that he can be arrested another day and held to answer. An officer who kills a person charged with a misdemeanor while fleeing from him is guilty of manslaughter at least. When a prisoner charged with a misdemeanor has already escaped, the officer cannot lawfully use any means to recapture him that he would not have been justified in employing in making the first arrest; and if in the pursuit, he intentionally kills the accused, it is murder; and if it appear that death was not intended, the offense will be manslaughter." *State v. Sigman,* 106 N. C., 728. The court further says that such use of a deadly weapon by an officer, as aiming it at one who is fleeing under such circumstances, is an assault, even if the officer did not in fact intend to shoot. *Sossamon v. Cruse,* 133 N. C., 470. In the latter case, this court said: "But assuming, for the purpose of the argument, that he could lawfully have pursued the defendant beyond the corporate limits in order to effect his arrest, he clearly had no right to use excessive force, and the use of a pistol, which is a deadly weapon, in attempting to arrest one charged only with the commission of a misdemeanor, is excessive force. In such a case the life of the offender must not be imperiled when he is only fleeing from arrest and trying to escape. This doctrine is well settled." This ws the admonition of Mr. Justice Foster: "With regard to the ministers of justice executing ordinary process

and likewise to private persons endeavoring to arrest, it behooveth them to be very careful that they do not misbehave themselves in the discharge of their duty for, if they do, they may forfeit the special protection of the law." Foster's Crown Law, 319. When an officer transcends his right in making an arrest by using excessive force and thereby putting human life in jeopardy, he becomes, by all the authorities, a trespasser from the beginning *(ab initio),* and they say that he stands in no better plight than an individual not clothed with official authority. He is no longer, as one of its ministers, under the protection of that law which he has himself grossly violated. An assault thus committed by him with a deadly weapon is like one committed by an unofficial person, so far as the right of the person assaulted to defend himself against the attack is concerned. *State v. Worley,* 33 N. C., 242; *State v. Queen,* 66 N. C., 617; *State v. Brittain,* 25 N. C., 17. How could the law be otherwise and be consistent with itself and true to its cardinal principles? Can it be assumed that the law denounces the wrongful act of the officer as a serious crime, and, if death ensue, as a capital felony, and yet that it does not permit the person assaulted to defend himself when he is not resisting the officer or making any attempt upon his life, but simply attempting to escape, an act which the same law says is not of sufficient gravity to justify the assault, as the fleeing person may again be taken, and which certainly does not forfeit life and require the person thus fleeing to tamely submit to be killed and thus lose his life without being permitted to defend it? Does the law, under such circumstances, leave him defenseless and to be dealt with at the mercy of a lawless officer? I have diligently searched the books and have been able to find no case decided by this or any other court, and no expression of a text writer, which gives countenance to any such doctrine. The law is supposed to be humane and I believe my brethren are greatly mistaken in their interpretation of the cases they cite,

and I will attempt to show later on that they are so mistaken, if they think that they sustain such a principle. No case like the one we have presented in this record has ever been before this court. Cases like it have been decided by courts in other jurisdictions and those courts have, it appears, been unanimous in rejecting the doctrine and asserting the very contrary to be the true and only one.

As the officer, by using excessive force in attempting to shoot the escaping misdemeanant, acts in his own wrong and is a trespasser from the beginning, the same as if he had no official authority to arrest, and as his act constitutes an assault with a deadly weapon which puts the life of the fleeing party in jeopardy, the latter by every ordinary principle of criminal law has the right to defend himself and save his life. "It will be observed that the law does not authorize the killing of a person, charged with a felony, unless he resists or flees, and cannot otherwise be taken. If the alleged felon can be otherwise taken, the killing is manslaughter at least, in the officer. And it is a felony in the officer if he wound a person not charged with a felony who is fleeing to escape arrest, and he is guilty of murder if he kill in pursuit one charged with a misdemeanor only, or required in a civil suit." Murfree on Sheriffs, sec. 1164 (p. 663). And he adds, in discussing the same subject, that an officer "When transcending his powers, or abusing his authority, may himself be lawfully resisted." Sec. 1160. "If unlawful violence is resorted to in the attempt to make an arrest for a misdemeanor, where it is not lawful to imperil life, the person whose arrest is attempted, will be justified in taking life." 1 McClain Cr. Law., sec. 302. The reasonableness of the apprehension that his life is about to be taken or that great bodily harm is threatened, is to be judged from the standpoint of the defendant at the time and not from that of the jury, the two questions being: (1) Did the accused believe himself in imminent danger? (2) Were the circum-

stances such as would justify such a belief in the mind of a person of ordinary firmness and reason? *Ibid.,* sec. 306. "It is also true that it is the duty of every citizen to submit to lawful arrest. There is, however, a broad distinction between resistance and avoidance; between forcible opposition to arrest and merely fleeing from it. See *The State v. Anderson,* 1 Hill (S. C.), 346. There is no rule of law that he who flees from attempted arrest in cases of misdemeanor thereby forfeits his right to defend his life. It is certainly possible for an officer of the law to commit a felony by shooting at a man or by other excessive violence, even when attempting his arrest, and it would follow that the party thus feloniously assaulted might defend his life." *Tiner v. State,* 44 Texas, 128. Deciding a similar case, it is said by the court in *State v. Oliver,* 2 Houston (Del.), 608: "Under this view of the case, the resistance of the prisoner to an unlawful attack, though such resistance should result in the death of the aggressor, could not amount to murder, but manslaughter only or homicide in self-defense. The law of self-defense justifies the repelling of force in such cases, even unto death, but gives no protection to wanton or unnecessary aggression." The court further says, that unless the prisoner resists intead of flees, and thus obliges the officer to resort to violence, he may not fire upon him, and if he is not resisted or opposed in such a way as to make that kind of attack prudent and necessary, but proceeds to execute even lawful authority in an unlawful way, he thereby clearly justifies resistance by the prisoner. *Ibid.,* 606. And so it was held in *Hardin v. State,* 40 Texas Cr. Rep., 208, "If," says the court, "appellant did not resist the officer, but was merely attempting to escape or evade an arrest, then the officer had no right to kill him; and if, under such circumstances, deceased first drew his pistol and shot at appellant to kill him or prevent his escape, the officer had no right to do this; and in such case appellant's right of self-defense would be perfect. This latter phase of the case

STATE *v.* DURHAM.

was not given to the jury at all, and yet there is some testimony tending to raise this phase of the case." Another court says: "The law does not allow a peace officer to use more force than is necessary to effect an arrest. If he does use such unnecessary force, he thereby becomes a trespasser from the beginning and may be lawfully resisted." *Plummer v. State,* 135 Ind., 313, citing authorities to sustain the decision. The court further says that the principle of self-defense applies as well to an officer attempting to make an arrest, who abuses his authority and transcends the bounds thereof by the use of excessive force and violence, as it does to a private individual who unlawfully uses violence. By his abuse, the officer divests himself of his official character and immunity from attack. "It must not be assumed that an officer in the execution of process would be protected in acts of violence upon the prisoner committed of his own wrong and not warranted in the performance of his duty. The conditions, under which an officer is deprived of the protection of his process, are those in which in executing it he, of his own wrong, commits acts of violence against the accused which are not justified in the execution of his process. Under such circumstances a right of self-defense by the accused may arise." *Bullock v. State,* 65 N. J. L., 572. To the same effect I cite *People v. Burt,* 51 Mich., 199; *Doolin v. Com.,* 95 Ky.; 29; *Bissot v. State,* 53 Ind., 416; *Galvin v. State,* 46 Tenn. (Cold.), 291; *Agee v. State,* 64 Ind., 340; *Miers v. State,* 34 Texas Cr. Rep., 161; 1 Kerr on Homicide, p. 217, sec. 189; *Creighton v. Com.,* 84 Ky., 103; *State v. Underwood,* 75 Mo., 230; *Alford v. State,* 8 Texas App., 545; *Minniard v. Com.,* 87 Ky., 213; *Noles v. Com.,* 26 Ala., 31; *State v. Scheele,* 57 Conn., 307; *Wright v. Com.,* 85 Ky., 123. "An officer in the execution of a valid order has the legal right to use such force as is necessary to execute it, but no more. Any unnecessary force or violence that may be used in the execution of such order or process is without

authority of law; and such excess, if any, may be lawfully met by force or violence sufficient to overcome it." *U. S. v. Terry,* 42 Fed. Rep., 317. "If an officer in attempting to execute process shall exceed the power conferred by the writ, he will be liable as a trespasser, but this will not authorize the defendant to resort to personal violence against the officer while so ·endeavoring to exceed his authority unless to protect his own person from violence and injury." *Smith v. People,* 99 Ill., 445. "Whether the arrest be legal or not, the power to arrest may be exercised in such a wanton and menacing manner as to threaten the accused with loss of life or some bodily harm. In such a case, though the attempted arrest was lawful, the killing would be justifiable." *Jones v. State,* 26 Texas App., 12. "If one, even an officer, undertakes to arrest unlawfully, the latter may resist him. He has no protection from his office, or from the fact that the other is an offender." 1 Bish. New Cr. Law, sec. 868. "One may defend himself against the wrongful assault of an officer, as well as against the assault of a person who is not an officer." *Appleton v. State,* 61 Ark., 592. In *Williams v. State,* 44 Ala., 44, the court held that while the citizen should submit when he has no reasonable cause to apprehend any worse treatment than a legal arrest will subject him to and seek redress from the law, instead of resisting, yet "in misdemeanors, it will be murder to kill the party accused for fleeing from the arrest, though he cannot otherwise be taken, and though there be a warrant to apprehend him. The citizen may resist an attempt to arrest him, which is simply illegal, to a limited extent, not involving any serious injury to the officer. He may oppose a felonious aggression upon him in the execution of a lawful arrest, even to slaying the officer, when it cannot otherwise be prevented." That an officer who exceeds his lawful authority by the use of violence becomes a trespasser *ab initio* and is in no better position with respect to the accused for whom he has process of arrest than an unofficial

person, is clearly shown in *Commonwealth v. Kennard*, 25 Mass. (8 Pick.), 133, and *Six Carpenters' case,* 1 *Smith's Leading Cases* (9 Am. Ed.), 261. To the extent, therefore, that the force is excessive, it may be met by the accused with such force as reasonably appears to him necessary to defend himself against the illegal attack which is threatened. If the officer is in the wrong and the life of the accused is endangered by his unlawful act, and no more force is used than is adequate to the protection of his life, the accused by no principle of law or justice can be adjudged a criminal. The mere fact that he attempted to avoid arrest, or to escape from one already made, by running away, was, of course, an unlawful act, for which perhaps he may be punished, but he was not thereby outlawed and put beyond the pale of the law's protection, and his unlawful act did not justify the officer in assaulting him with a deadly weapon. Resistance to this abuse of power, but not resistance to arrest, was a lawful act if properly exerted. He was not resisting arrest, but merely avoiding it by flight. If a person resists a lawful arrest and kills the officer it is murder; if an illegal arrest, and no excessive force is used, it is manslaughter, but if the officer uses excessive force and threatens the life of the accused, when the arrest is for a misdemeanor, the latter may defend himself, if he is merely escaping, whether the arrest is legal or illegal. This is clearly established by the great weight of authority and this court practically stands alone in asserting the contrary doctrine.

Before taking leave of this part of the case, and in this connection, we may not inappropriately quote the language of a learned text writer: "The manner in which an arrest should be made is a matter of no small importance. It is hardly necessary to say that the law, while requiring a strict obedience to its mandates, will tolerate in its ministers no unnecessary violence. *Molliter manus imponere,* is as far as, under any normal circumstances, an officer can go with safety,

and one who endangers the lives or limbs of others, or inflicts great bodily injuries in the discharge of his official duties, should be prepared to justify his conduct by proof showing that he acted under the pressure of an irresistible necessity. It may be remarked, however, that there is prevalent, not only among officers of every grade, but throughout the community, an exaggerated idea of the powers in this respect which the law vouchsafes to its ministers. A sheriff, constable or policeman, with a revolver, and a warrant charging a misdemeanor, is popularly supposed to hold the keys of life and death, and as he frequently shares in the delusion, he abuses his powers with, sometimes, very tragical results. What the law does allow in the use of physical force is the very minimum by which the desired object can be obtained. Whatever a rash or over-zealous officer may do in excess of this is without warrant of law." Murfree on Sheriffs (1884), sec. 148; *Brockway v. Crawford,* 48 N. C., at p. 440. As he then becomes the aggressor, the accused, who was originally a wrongdoer by escaping, is remitted to his right of self-defense, whereas if he had resisted he would not be. The fact must not be overlooked, but emphasized, that the defendant, as the evidence of an eye witness shows, did not draw his pistol until he was first fired upon by the officer. At least the jury could have inferred this to be the case. A more flagrant violation of the law by the officer could not be imagined. The defendant was a law-breaker, but was not an outlawed felon. At the time, he was perfectly harmless and yet, under such circumstances, it is said he had no right to defend himself against a most violent assault which put his life in immediate jeopardy. Surely that cannot be the law of this age. As the court remarked in *State v. Campbell,* 107 N. C., 948, the fact that he had a pistol on his person afforded stronger reason why he should not have been attacked contrary to law.

But it is said that this court has decided otherwise than

as I contend is the law, in *State v. Garrett,* 60 N. C., 145, and *State v. Horner,* 139 N. C., 610. In my judgment they do not so decide, but are in perfect harmony with the authorities cited in this opinion. The indictment in *Garrett's case* was against the officer for murder in killing the deceased, for whom he had a warrant and who was openly resisting him, as the jury found under the evidence and charge, and not merely attempting to avoid arrest by flight. The *Chief Justice* there says that, if the deceased had been attempting to make his escape by moving off, there would have been no necessity for shooting him and the officer would have been guilty of an abuse of his power and would have become a trespasser *ab initio.* It is only when the officer has a right to kill, as in the case of resistance, or when a felon is pursued, and it becomes necessary to do so, that he is justified and is not a trespasser. The case recognizes the very distinction we have endeavored to show in fact exists. It·does not, it is true, decide the question involved in this case, as the officer was indicted and not the party for whom the process had been issued. It is not, for this reason, an authority against my view, but expressions in the opinion of the court tend strongly to sustain it.

In *Horner's case,* the defendant was the person against whom the warrant was issued and he killed the officer. This is our case, but the evidence most favorable to the defendant tended to show that Horner not only resisted, but defied the officer to arrest him. He was no escaping misdemeanant and the court so says. Here is its language: "It was his duty to submit to arrest, and in resisting it with a gun in his hand it is not open to him to say that he acted in self-defense." I concurred in this statement of the law and still concur. The evidence in that case shows that at no time before the killing did Horner occupy any attitude but that of an obstinate and armed resistance to the law. There was no evidence that he was merely running away to avoid arrest,

as was the defendant in this case. He was in easy reach of his gun, which he could have used with deadly effect in an instant, and actually picked it up and still defied the officer. He ran when the officer shot, but he was then running from the shot and not merely from the law. For the time being he was doubtless frightened by the situation in which he had involved himself, but he soon recovered his courage and made another bold stand against the officer. It is to be noted that, when the officer fired, Horner was walking off with his gun in his hand, not running to avoid arrest. He had just picked it up and the officer might well have supposed for the purpose of using it. A moment before he was standing by it and refusing to be taken. He was in a sullen and defiant mood, and his conduct indicated bitter hostility to the officer. This was a clear case of resistance and the court so regarded it. How different from our case, in which it appears that the defendant fled with all possible speed, making no resistance whatever until his life was put in imminent peril, when he fired evidently to save it. There was no necessity for the officer to shoot, as in *Horner's case,* when the defendant was standing before him in armed resistance, his every word surcharged with anger and his every act and movement menacing the life of the officer. In a case like ours, the merciful rule of the law is that it is better to let the accused escape, when the charge is so trivial, than to shed human blood, as he may be taken another day and held to answer. *State v. Sigman, supra.* As to the position of the party assaulted under such circumstances, I cannot do better than to conclude with the words of an eminent writer, whose perfect knowledge of the science of the law is beyond question: "The right of resistance to illegal official action, it must be remembered, is essential, not merely to all free government, but to any government whatsoever. The Roman law has been charged with being despotic; but by the Roman law this right is repeatedly and unreservedly recognized.

STATE *v.* DURHAM.

If there be no jurisdiction in the officer, then issues the terse command, *'Vim vi repellere licet.'* When an officer transcends his powers, obedience to him may become even an offense." 1 Wharton Cr. Law (9 Ed.), sec. 646. The law requires that each member of the body politic, citizen as well as officer, should be kept in his due orbit, the latter exercising only such powers as the law confers and only in the way allowed, and the former being free to resist aggression when necessary in his own defense. Dr. Wharton thought that a sound, free and enlightened jurisprudence required a very close approximation of the principles of the Roman jurists and a rejection of the feudal policy which exacted of the vassal implicit obedience and abject submission to the lord and his bailiff or, as the alternative, his life.

It must not be inferred that I think the defendant was entitled to an acquittal. Not by any means. He might, perhaps, have been convicted of murder, if he fired without any apparent necessity; and of manslaughter, if he fired without legal provocation or other circumstances to reduce the killing below the grade of murder, or he might have been acquitted, the verdict being determined by the facts as the jury should find them to be and the law as declared by the court. If he shot upon malice it would be murder; if upon legal provocation, manslaughter; but if in self-defense against a deadly assault by the deceased, who, at the time, had ceased to be under the protection of the law as an officer and had become a trespasser, then he should be acquitted. When the court instructed the jury that he was guilty *at least* of manslaughter and thereby excluded the principle of self-defense from the case, an error, in my opinion, was committed which entitled the defendant to a new trial.

The statute cited by the court (Act of 1889, chap. 51, p. 65,) cannot posibly make any difference in the result. It is merely declaratory of the common law, and even if it had been the enactment of a new principle, it could not take the

case out of the operation of the rule upon which rest the decisions in other jurisdictions cited by us. Nor do I know of any special conditions existing in, this State which render the principle of the decision in this case "essential to preserving good order and asserting the supremacy of the law.".

CONNOR, J., concurs in the dissenting opinion.