## STATE v. HENDERSON ALFORD.

*Indictment—Murder—Manslaughter—Homicide of Officer.*

On the trial of an indictment for murder, it was in evidence that the prisoner had escaped from jail the day previous to the homicide, where he had been confined on a charge of larceny; that the deceased, an acting constable and deputy sheriff, went at night with a *posse* to arrest him and sat down in the edge of a path, near prisoner's house; that the prisoner came along the path and was commanded by deceased to "halt and give an account of yourself," when he fired and killed deceased; that it was a dark night, but the prisoner could have seen the sheriff's *posse*; *Held,* to be error in the court below to refuse to charge "that if deceased did not make known to prisoner and prisoner did not know he was an officer the offence was manslaughter."

INDICTMENT for Murder tried at August Term, 1878, of WAKE Criminal Court, before *Strong, J.*

The prisoner was charged with the murder of Thomas J. Passmore, a constable and deputy sheriff. He was arrested by deceased upon a warrant of a justice of the peace for larceny and committed to the jail of Wake county, where he was confined for three months, and then made his escape by assaulting the jailor and taking his pistol which he carried off with him. The sheriff immediately sent a message to the deceased informing him of said escape and instructing him to arrest the prisoner. T. R. Wilson, a witness for the state, testified that he lived in the neighborhood of the prisoner, and on the night of the 17th of September, 1876, the day after the escape, he received a message from the deceased and in consequence he went to the house of one Simon Mann and found there five other men, among whom was deceased. The deceased then explained to them that he wished them to aid him in arresting the prisoner. Thereupon they went to the prisoner's about three-quarters of a mile distant, and at eight or nine o'clock at night, and sat down in the edge

of a path near prisoner's house. The prisoner told his wife to take care of herself, he was going off and did not know when he would see her again. He came along the path in eight or ten feet of deceased, when deceased said "halt and give an account of yourself," and the prisoner immediately shot him and ran. The party were armed, but deceased had given them orders not to shoot prisoner, that he was not authorized to shoot him. Upon cross-examination he stated that prisoner's house was in the woods, not very thick, but some undergrowth; it was right smart dark at the time; there were some small clouds; the prisoner could have seen the sheriff's *posse.*

There were fourteen instructions prayed by prisoner's counsel, the seventh upon which the case turns being as follows: "If deceased did not make known to prisoner, and prisoner did not know that he was an officer, the offence is manslaughter." His Honor refused to charge as requested, but told the jury in substance, if they should find that deceased and his associates were seeking to arrest the prisoner in obedience to instructions, and prisoner shot deceased under the circumstances deposed to by the witness Wilson, the prisoner at the time having good reason to believe from all the circumstances that deceased was an officer engaged in arresting him on the charge aforesaid, he would be guilty of murder; but if he did not know or have good reason to believe he was an officer and attempting to arrest him, and believed that he was in danger of life or great bodily harm and fired the fatal shot to protect, himself, he would not be guilty; and if the prisoner did not know or have good reason to believe that deceased was an officer engaged with his associates in attempting to arrest him, and being restrained of his liberty or having reasonable ground to believe that he would be immediately so restrained by deceased unless he was prevented, and shot him under the influence of passion

thereby excited, he would be guilty of manslaughter. Verdict of guilty of murder, judgment, appeal by prisoner.

*Attorney General* and *D. G. Fowle,* for the state.
*Messrs. J. E. Bledsoe* and *B. B. Lewis,* for the prisoner.

ASHE, J. The prisoner took several exceptions to the ruling of His Honor in regard to the formation of the jury and the admission of testimony, and prayed for numerous instructions to be given to the jury, but for the purposes of this appeal it is only necessary to notice the seventh in the series, which is as follows: "If deceased did not make known to prisoner, and prisoner did not know that he was an officer, the offence is manslaughter." The court refused to give this instruction, in which we think there was error.

The prisoner some months previous to the homicide had been committed to jail on a charge of larceny, and on the day preceding had escaped from prison, committing at the time the further crime of robbery by carrying off the pistol of the jailor. These facts were known to the deceased who was an acting constable and deputy sheriff in the county of Wake, whose right and duty it was to arrest the prisoner; and on the night after the prisoner's escape, he went with a *posse* to the prisoner's house, and they concealed themselves near by in the woods where there was some undergrowth. It was night, but whether the moon shone, or it was light enough to distinguish one's face or person does not appear. The prisoner left his house and went along a path leading by the place where the deceased and his party were concealed, and when he approached within eight or ten feet of them, the deceased commanded him to "halt and give an account of yourself," when the prisoner immediately fired upon the deceased and gave him the wound of which he died.

The deceased and several of his party had guns, and the witness, Wilson, thinks the prisoner could have seen them, though it was "right smart dark, and some small clouds." If the prisoner had known the deceased was an officer, or it had been shown that it was light enough to distinguish one man's face or person from another, or that the prisoner had been well acquainted with deceased and most probably would have recognized his voice, it might have materially changed the character of the case. But none of these circumstances were proved on the part of the state.

If it had been daylight, the deceased being an officer "*jurus et conus*," it would not have been necessary for him to have told his business, or to have indicated the character in which he had come. But being in the night time, for aught that appears too dark for him to recognize the deceased, it was the duty of the latter to have notified the prisoner of his purpose and official character. The law throws its protection around ministers of justice while in the discharge of their official duties, but they must perform them with due care and in compliance with its requirements; otherwise the law gives them no greater protection than is given to private individuals. And though a private person may arrest when a felony has been committed, yet unless he gives notification of his purpose to arrest for the crime, the slaying of him by the felon would be no more than manslaughter. 1 East, P. C., 314; 1 Whar. Cr. Law, § 1,040; Foster, 311.

If the officer attempting an arrest in cases of riots and affrays is known or generally acknowledged to be the officer he assumes to be, the law will presume the party killing him had due notice of his intent, especially if it be in the day time. In the night some notification is necessary, as commanding the peace, or using words of like import notifying his business. Foster, 310.

" In these cases," says Mr. East, " small matter amounts to

notification. It is sufficient if the peace be commanded, or the officer declares in any other manner with what intent he interferes, or if the officer be in his proper district and known or generally acknowledged to be the officer he assumes to be, or if in order to keep the peace he produces his staff of office or any other ensign of authority, the law will presume that the party killing had due notice of his intent, especially if it be in the *day time;* if in the *night* when such ensigns of authority cannot be distinguished, some further notification is necessary."

This doctrine seems directly applicable to the present case. It was in the night, dark and cloudy; the deceased and his party who were armed with guns could be seen by the prisoner, but it does not appear that there was light enough for him to distinguish the one from the other; and the deceased used no words that intimated his intent or official character. The prisoner may have supposed they had come to take his life.

Wharton, in his valuable work on criminal law, mentions the case of a man who was violently set on in the night time by a mob, and in self defence killed a person seizing him, which person was an officer seeking to arrest him, and it was held necessary to bring notice of this fact to the prisoner to deprive him of his plea of self defence; and also another case, where a bailiff rushed into a gentleman's bed chamber early in the morning without giving the slightest intimation of his business, and the gentleman not knowing him, in the impulse of the moment, wounded him with his sword and killed him, and it was held to be manslaughter. 2 Whar. Cr. Law, § 1,041, 2.

There is error. Let this be certified that a *venire de novo* may be awarded to the prisoner.

Error. *Venire de novo.*