STATE v. HORNER.

(Filed November 15, 1905).

*Homicide—Confessions—Argument of Counsel—Self-Defense—Resisting Arrest—Evidence.*

1. Confessions, obtained by threats made, or inducements held out, to persons under arrest, or surrounded with a number of pursuers or otherwise so situated as to render it doubtful whether they were freely and voluntarily made cannot be used against a person charged with a crime.

2. Where, however, it appears that no inducements were offered the prisoner and no threats made, and after the arrest he was treated kindly, and did not seem to be excited or afraid, and began the conversation on the way to jail, with those who had arrested him, the fact that the prisoner was tied and had been shot by those who arrested him and two men were in the wagon with .him and three or four others following, does not render his confession made under such circumstances, inadmissible.

3. Exceptions relating to the language of counsel must ordinarily be left to the discretion of the trial judge and this court will not review his discretion unless it is apparent that the impropriety of counsel was gross and well calculated to prejudice the jury.

4. Unless an exception to language used by counsel is taken, either at the time the language is used, or by request to the court to instruct the jury that they must disregard the objectionable language, it cannot be assigned as error.

5. There is a difference between arguments addressed to the jury, which are either illogical or irrelevant, and the use of abusive and degrading epithets or characterization of parties or witnesses.

6. Where the prisoner knew that the deceased was a deputy sheriff, and that he had a warrant for his arrest for a misdemeanor it was his duty to submit to arrest and in resisting it, with a gun in his hand, it is not open to him to say that he acted in self-defense and this is not affected by the fact that the officer was not justified in shooting him to make the arrest.

8. When a man puts himself in a state of resistance and openly defies the officers of the law, he is not allowed to take advantage of his own wrong, if his life is thereby endangered, and set up the excuse of self-defense.

INDICTMENT for murder against Jas. K. Horner, heard by *Judge Geo. W. Ward* and a jury, at the August Term, 1905, of the Superior Court of ORANGE County. From a verdict of murder in the second degree and the sentence thereon, the prisoner appealed.

*Robert D. Gilmer, Attorney General,* and *Winston & Bryant* for the State.

*Boone & Reade, S. M. Gattis, P. C. Graham* and *J. W. Graham* for the prisoner.

CONNOR, J. Prisoner was charged with the murder of one Nichols, a deputy sheriff. Deceased was endeavoring to arrest prisoner, having in his hands a warrant for a misdemeanor. After a verdict of murder in the second degree, followed by a judgment, prisoner appeals, assigning a number of errors in His Honor's rulings. It is not necessary to consider all of the exceptions because if there is no element of self-defense disclosed in the testimony, His Honor correctly instructed the jury that they should find the prisoner guilty of manslaughter at least. There is no exception pointed to the instruction in regard to murder in the second degree. The first exception is directed to the admission of evidence tending to show a confession. The State introduced one G. C. Ray, who testified that he assisted in bringing prisoner to jail. He had been shot by those who arrested him. Did not seem to be suffering very much from the shot. After travelling two or three miles, prisoner began the conversation. Two men were with him in the wagon, three or four others following on horses and in buggy. He was tied but had stated that tieing did not hurt him. There was a

bed in the wagon and he seemed to be comfortable.   No in-
ducements were offered him and no threats made. He did not
seem to be excited.   Dr. Jordan was called who testified that
he examined prisoner after he was arrested and found that
his neck was peppered with small shot—seemed to be suffer-
ing some pain; was feeble from having been in the woods for
sometime without nourishment.   He was complaining of a
dislocated shoulder.   Witness set his shoulder and had food
provided for him.   After the arrest he was kindly treated,
no indignities were offered him—seemed to be perfectly
sound in mind.   Did not seem to be afraid when the guard
started with him to jail.   The court found that the statement
was voluntary.   Witness Ray was asked to state what he
said.   Prisoner objected—objection overruled and prisoner
excepted.   Witness stated that prisoner asked when Nichols
died and what part of his body he was shot.   He said that
Nichols acted too hastily in following him and that he had
acted too hastily in shooting him.   That Nichols had lost
his life and he would now lose his.   He said that he told
Nichols that he was not going to be arrested by him; that
Nichols said he would arrest him; that he told Nichols if he
followed him he would shoot him; that Nichols did follow
him and that when he got within five or six feet of him,
he turned and shot.   Witness asked him who shot first and he
said that some of them told him that Nichols shot at him
first with a pistol.   The exception cannot be sustained.
This court has uniformly refused to permit confessions, ob-
tained by threats made, or inducements held out, to persons
under arrest, or surrounded with a number of pursuers or
otherwise so situated as to render it doubtful whether they
were freely and voluntarily made to be used against a person
charged with crime.   We have no disposition to depart from
or weaken the salutary and humane principle upon which
the decisions are based.   We fully approve the language of
*Mr. Justice Reade,* in *State v. Dildy,* 72 N. C., 325, in re-

gard to the admissibility of confessions. We think, however, that the confession made in this case comes directly within the exception "when he voluntarily opens the door and invites us in." The testimony of Ray and Dr. Jordan brings the case clearly within the decisions of this court in *State v. Whitfield,* 109 N. C., 876; *State v. Daniels,* 134 N. C., 641; *State v. Exum,* 138 N. C., 599. The next exception is directed to the language used by the counsel for the State referring to the prisoner as an "outlaw." It appears that counsel, assisting the solicitor in his opening speech, argued that from the evidence prisoner was an outlaw to which no objection was made. Counsel for prisoner replied vigorously to the language used by counsel for State. The solicitor in his closing argument referred to the criticism of the counsel for prisoner and argued that upon the evidence prisoner was an outlaw. Prisoner's counsel objected and asked the court to hold that such language was improper. His Honor did not respond to this request. The solicitor then stated, that as he understood it, an outlaw was a man who put himself beyond and outside the reach of the law. That prisoner admitted that he had been indicted in the State and Federal courts, and that when the officer came to arrest him, he would not go with him, etc., and he submitted to the jury that from these facts the imputation that he was an outlaw was not an unjust one, but was warranted from all the facts and circumstances of the case. To these remarks prisoner excepted. As has been frequently said by the court in passing upon exceptions to language used by counsel, it is difficult to define the line between that which rests in the sound discretion of the presiding judge and that which, as a matter of law, is subject to revision upon exception and appeal. The exception was duly and in apt time, taken and the question is fairly presented whether the language of the solicitor falls within the prohibited domain of debate as being prejudicial to the pris-

oner.  *Reade, J.,* in *Jenkins v. Ore Dressing Co.,* 65 N. C., 563, says:  "It is difficult to lay down the line, further than to say, that it must ordinarily be left to the discretion of the judge who tries the cause; and this court will not review his discretion unless it is apparent that the impropriety of counsel was gross, and well calculated to prejudice the jury."  It is settled by this court that unless exception is taken, either at the time the language is used, or by request to the court to instruct the jury that they must disregard the objectionable language it cannot be assigned as error.  The cases are collected and discussed in *State v. Tyson,* 133 N. C., 692.  The solicitor did not apply the term "outlaw" to the prisoner in the sense in which it is used in the statute, as one who was to be dealt with otherwise than by the procedure provided for the trial of those charged with crime.  It is not very clear in what way or for what purpose the term was used or intended to impress the jury.  The fact that he was being tried according to the forms of law excluded the idea that it was contemplated that the jury should convict otherwise than as they were sworn and charged according to the law and the evidence.  It would seem that counsel were indulging in that kind of license which poets claim and are permitted to indulge.  We cannot think that the jury in the light of the charge of the court, supposed that they were trying the question submitted to them by the solicitor, whether, upon the evidence, the argument that he was an outlaw, was justified.  There is a difference between arguments addressed to the jury, which are either illogical or irrelevant, and the use of abusive and degrading epithets or characterization of parties or witnesses.  The former may be disposed of in reply, or, either of its own motion, or upon request by the court; they are usually disposed of by the common sense and intelligence of the jury.  Abusive epithets or denunciatory characterizations, unless counteracted, are calculated to prejudice the minds of jurors, arouse their passions and un-

settle their judgments. It is a matter of common observation that a charge made against a man without foundation, will make but little and only temporary lodgment in the mind of others, whereas an odious or degrading name or term of reproach once attaching to a person will follow and degrade him for years. No one was contending in this case, nor was it material to the guilt of the defendant to maintain the proposition that the deputy sheriff would have been justified upon the testimony in shooting the prisoner. The question, whether he had placed himself beyond or outside the protection of the law, was not involved in the issue. It was rather whether, assuming that the officer unlawfully shot at him, the prisoner's attitude and conduct was such that he could, even in self-defense, take the life of the officer. In many cases the attitude of both parties precludes a successful defense when charged with felonious homicide. While it would have been eminently proper for the judge, in his charge, to have said to the jury that they should discard from their minds all that was said in regard to the prisoner being an outlaw, and doubtless he would have done so, it is manifest that in his opinion that and very much more of the argument became irrelevant because of the instruction which he gave in regard to the law of the case. While we do not commend the use of any term of reproach in regard to a witness, and certainly not to a defendant on trial, we cannot say that the breach of privilege is gross or manifestly prejudicial. The prosecuting officer is in a sense and, in a very important sense, a judicial officer and aids the court and jury in the administration of the criminal law. He should use a sound judicial discretion, both in respect to the evidence he will offer and the arguments he will use to aid the jury in arriving at a correct verdict. Representing the people of the State, he wishes no verdict against the citizen unless it is the result of truthful, competent testimony, considered in the light of fair, legitimate argument. We are sure such

is the rule by which the prosecuting officers of the State are guided. While we do not think that upon principle and decided cases, the language used, and the course pursued would entitle the prisoner to a new trial, it is manifest that, in the light of the instruction given the jury, no harm in this respect was done the prisoner. His Honor instructed the jury that the testimony considered in the light most favorable to prisoner made him guilty of manslaughter at least. The exception to this instruction is based upon the contention that in certain aspects of the testimony, if believed by the jury, the homicide was *se defendo*. For the purpose of passing upon this exception, the testimony of prisoner in his own behalf, together with other testimony from which the most favorable inferences could be drawn, should alone be considered. The State introduced A. W. Breez, a deputy sheriff, who testified that deceased had a warrant for prisoner charging him with a misdemeanor. That witness went with deceased to make the arrest—drove into the yard—no one in house—saw prisoner's wife and sister in the yard. Deceased searched the house, did not find prisoner. Started towards the house of prisoner's son, when deceased said: "Yonder is Knapp now. He was squatted down behind a tree with a gun in his lap. Deceased said he would go and talk with him. Just as he got to him, deceased said, "If you will meet me at 'Squire Terry's tomorrow at 2 or 3 o'clock, I will summon witnesses and go back home." Prisoner said, "I will go with you nowhere—no such trash as you are, and if you follow me I will shoot you." Deceased called to witness to come on. Prisoner walked further back into the woods. Witness got out of buggy and fastened mule—"just as I got last trace undone, heard both shots fired at same time. I started in a run and met Nichols about ten steps on side next to road." Witness described condition of deceased; his language in regard to the extent of his wounds—that he was bound to die, etc., and further that he said, "Defendant

Horner shot first and he shot next; that Horner ran after he shot; that they were not five steps apart, he said he did not try to hit defendant and that defendant just flung his gun around and shot." He further testified in regard to seeing the warrant and finding pistol in pocket of deceased, one chamber empty, etc. It was in evidence that deceased had gone to prisoner's house with warrant before, but had not arrested him.

Prisoner testified: "I was in the woods; dog had treed a squirrel. Nichols and Breez came on down the road. Nichols called to me and I answered. He said come on and go with me; had a warrant; he read it. I said I am not going to do it; he said if I would promise to be at 'Squire Terry's tomorrow at 3 o'clock, he would go. I refused. He came on me and said to me (with an oath) 'if you do not go with me I am going to shoot you.' Then I picked up gun and walked off; he shot at me; I ran about fifty yards; he shot again and I threw gun around and shot. I was going away from him; was out there for a squirrel. I ran against a tree when he was after me; knew that deceased was a deputy sheriff." Witness also testified that deceased came to his house that morning with the warrant and that he, prisoner, said that he had done nothing, wanted to see the prosecutrix who had sworn out the warrant and fix it up. That he went into the house to get his shoes and came back; deceased drew his gun on him and cursed him, saying he was going to kill him. Prisoner had no gun when he came out of the house; deceased had a. gun. There was other testimony in regard to the conduct and language of the parties at the prisoner's house in the morning, also by witnesses who heard the two shots in the woods. Taking the testimony of the prisoner to be true, and we find nothing in the other testimony more favorable to him, we concur with His Honor that the plea of self-defense cannot be sustained. He admits the homicide with a deadly weapon, thereby taking upon

himself the burden of showing that he was acting in self-defense. The deceased was acting strictly in the line of his duty in endeavoring to make the arrest and the prisoner was, upon his own showing, avoiding, if not resisting arrest. The principle governing the case is thus stated by *Pearson, C. J.,* in *State v. Garrett,* 60 N. C., 145, "When a man puts himself in a state of resistance and openly defies the officers of the law, he is not allowed to take advantage of his own wrong, if his life is thereby endangered, and set up the excuse of self-defense." The application of this principle to prisoner's testimony sustains His Honor in saying to the jury that he was guilty of manslaughter at the least. 21 Am. & Eng. Enc. (2nd Ed.), 122; *Talbert v. State,* 71 Miss., 179 (42 Am. Rep., 454); *State v. Shaw,* 73 Vt., 149; *State v. Alford,* 80 N. C., 445. The prisoner knew that deceased was a deputy sheriff and that he had the warrant for his arrest. It was his duty to submit to arrest, and in resisting it, with a gun in his hand, it is not open to him to say that he acted in self-defense. Conceding that, as he was going away from the officer, refusing to submit to arrest, the officer was not justified in shooting him to make the arrest, does not affect his right to kill. If there was a necessity to shoot the deceased to save his life, it was the result of his unlawful act in resisting the mandate of the law. The position of the prisoner is similar in this respect to one who brings on or provokes a difficulty, and in the progress of it, kills. It is not *se defendo* because he brought on the necessity. This is elementary and uniformly sustained by numerous cases in our own and other jurisdictions. The learned counsel for the prisoner calls to our attention many authorities discussing and defining the power and right of the officer in making arrests. We concur with his views upon that question, but as we have said, and His Honor held, that is not the test of the prisoner's guilt. It may be that the

prisoner was right in saying that both acted hastily, but he was in the wrong in refusing to submit to arrest, and the law fixes the responsibility for the homicide upon him. If the killing is of malice, it is murder; if premeditated, it is murder in the first degree—in no aspect is it in self-defense. This view renders it unnecessary to consider the numerous exceptions to the refusal of His Honor to give special instructions, many of which were correct propositions of law, but not applicable to the testimony. His Honor correctly instructed the jury in respect to the difference between manslaughter and murder and the different degrees of murder. We have examined the record with the care which the result of our conclusion demands. His case was argued by counsel with a wealth of learning and ability. He chose to resist arrest for a misdemeanor and brought upon himself the awful crime of which, upon his own testimony, he stands properly convicted. It must be certified that there is

No Error.