## WILSON v. RAILROAD.

(Filed October 16, 1906).

*Railroads—Negligence—Kicking Cars—Running Switch—Instructions — Proximate Cause — Violation of Ordinance—Damages, Compensatory and Punitive—Contradictory Instructions.*

1. It is negligence to permit a car to be "cut loose" and roll on uncontrolled by any one across a much-used crossing.

2. In an action against a railroad for injuries received at a street crossing, where there was evidence that the car was "kicked" across the street to make a running switch, with no one on it, and that the plaintiff was doing all he could to safeguard himself, a motion of nonsuit was properly overruled.

3. An objection to an instruction that it ignored the necessity for determining the proximate cause of the injury is not well taken, where the jury had just been told in unmistakable terms that they must find "that such negligence produced the injury complained of," and again "that such negligence was the proximate cause of the injury," before they could answer the first issue "Yes," as the charge must be taken in its entirety, and not in "broken doses."

4. The use in an instruction of the language that "the fact that the plaintiff was deaf does not make him an outlaw," when taken in connection with the charge which preceded it, could not have made the impression upon the jury that the Judge was so hostile to the defendant as to intimate an opinion that it was treating the plaintiff as an outlaw, and does not necessitate a new trial.

5. An exception to an instruction "that if the jury find that the defendant was operating the train which injured the plaintiff in violation of a city ordinance, and that it did not have a man on the end of the car as required by said ordinance, then this alone is a sufficient circumstance from which the jury may infer negligence on the part of the defendant, and to justify them in answering the first issue 'Yes,'" is without merit.

6. An instruction that "in considering the question of damages and in the attempt to reach the amount which the jury will award, they may take into consideration the question whether the injury was due to such negligence which amounts to a little more than an accident, or, such negligence that shows wanton disregard of the

334 of IN THE SUPREME COURT. [142

rights of the plaintiff, and if they find that the conduct of the defendant has been such as to indicate a reckless disregard of its duty to the plaintiff, they may, if they feel disposed, increase the allowance of damages for that reason," is erroneous where there was neither allegation nor evidence that the injury was wilfully, wantonly and recklessly inflicted in utter disregard of plaintiff's rights.

7. Where the Court charged as to compensatory damages and then instructed the jury practically that punitive damages might be allowed, and "at the conclusion of the whole charge, counsel for plaintiff asked if the Court would not charge that plaintiff could recover punitive damages, and the Court said that it would charge the jury that they must not allow punitive damages," these contradictory instructions upon the issue of damages entitle the defendant to a partial new trial; for if the Court intended to correct his charge, it was his duty to have called the attention of the jury to it as a correction.

ACTION by C. D. Wilson against the Atlantic Coast Line Railway Company, heard by *Judge James L. Webb* and a jury, at the May Term, 1906, of the Superior Court of NEW HANOVER.

This was an action to recover damages for an injury received by the plaintiff at the crossing of the defendant's tracks over Nutt Street in the city of Wilmington. The Court submitted the three issues relating to negligence, contributory negligence, and damage. The jury found the issues in favor of the plaintiff and assessed his damages. From the judgment rendered, the defendant appealed.

*Rountree & Carr, W. J. Bellamy* and *W. Kellum* for the plaintiff.

*Davis & Davis* for the defendant.

BROWN, J. The plaintiff was walking on Nutt Street in the city of Wilmington, at a locality where many of defendant's tracks cross it leading to the wharves on the Cape Fear River, when he was run into by a car and knocked down and injured. There are no exceptions to the introduction of evi-

WILSON *v.* RAILROAD.

dence, and the errors we are asked to review are confined to the charge of the Court.

The evidence is very conflicting as to how the injury was occasioned, as to speed of the moving car, as to whether it was an attempt to make a running switch, and as to the vigilance of the flagman and the other servants of the company. There was evidence introduced by plaintiff tending to prove that the crossing is a dangerous one; that there are some fifteen tracks crossing Nutt Street there; that trains and engines are constantly going in different directions at the same time on some of these tracks; that the street leads across these tracks to the Seaboard Air Line depot, and that there is much traffic and passing along it; that there are no gates to close when engines and trains are passing and only one flagman whose duty it is to warn passers of the approach of trains.

Plaintiff testifies that on 16 January, 1905, he had crossed thirteen tracks and was looking out for the cars; that he saw some up towards the bridge standing still; that he then looked towards the compress for cars on that track; that he continued to walk on, looking for cars, when he was hit by one unawares and badly injured; that the car was a flat-car with no one on it; that Mr. Hankins, the crossing-flagman, was in a little house 125 feet away, and if he saw him he did not come to his rescue. Plaintiff also offered some evidence tending to prove that the flat-car which struck him was a loose car which had been "kicked," in railroad parlance, from the train for the purpose of making a "running switch"; that the car was moving fast across Nutt. Street when it hit plaintiff, and that "there was no one on it or near it"; and one witness said that "there was no flagman at all." There was strong contradiction of this evidence by defendant's witnesses, but it is unnecessary to set out the tenor of their evidence.

The defendant offered, also, evidence tending to prove contributory negligence upon the part of the plaintiff.

It is not to be doubted that upon plaintiff's showing the defendant was guilty of negligence, and in the absence of contributory negligence the plaintiff is entitled to recover damages.

The attempt to make a running switch across a much-frequented street is not only a negligent, but a most dangerous and unwarranted operation, and has been so held by a number of courts: *Bradley v. Railroad,* 126 N. C., 735; *Brown v. Railroad,* 32 N. Y., 597; *Fulmer v. Railroad,* 68 Miss., 355; *Railroad v. Summers,* 68 Miss., 566; *French v. Railroad,* 116 Mass., 537; *Railroad v. Garvey,* 58 Ill., 83; *Railroad v. Baches,* 55 Ill., 379.

It matters not whether the purpose was to "shunt" the car off on a switch or to give it force enough to roll along on the same track: it is negligence to permit a car to be "cut loose" and roll on uncontrolled by any one across a much-used crossing.

The jury having taken plaintiff's version as the true one, there is sufficient evidence to uphold their finding on the first issue. Upon the issue of contributory negligence the evidence is conflicting. The evidence of the plaintiff, carefully examined, tends to prove that he was exercising all the care a man in his condition and circumstances could well exercise. There are a great many tracks along there, and the most prudent of men may get confused; but the plaintiff states how he looked, and where he looked, and it is evident from his statement he was doing all he could to safeguard himself. The plaintiff's evidence, if believed, abundantly justified the verdict of the jury. It is therefore our opinion that his Honor properly overruled the motion to nonsuit. It is not necessary that we should set out his Honor's charge. It is very clear and comprehensive, stating with fullness and fairness the contentions of plaintiff and defendant and then instructing the jury clearly as to the law upon the different phases of the evidence. At the close of the evidence the Court

gave certain instructions at request of plaintiff, and in the words of the prayers, which are excepted to. Among others, he gave the following:

"If the jury find from the evidence that the crossing along Nutt Street, having fifteen or more tracks upon which engines and cars were constantly shifting, was used by a very large number of people in the conduct of their business, then it was the duty of the defendant to furnish to persons desiring to cross the railroad at Nutt Street, in the city of Wilmington, either on foot or with vehicles, a reasonably safe method of crossing, either by way of bridges, gates, an adequate number of flagmen or watchmen, or in some other way. That even if the jury should find from the evidence that the plaintiff was negligent in not using ordinary care in looking and listening for approaching trains, still the jury should answer the first issue 'Yes' if they further find from the evidence that the defendant could have prevented the injury by the use of means at hand or that it could have had at hand by the use of reasonable care and diligence; and the fact that the plaintiff was deaf does not make him an outlaw, neither does it lessen the responsibility of the defendant company to warn him of approaching danger."

The first objection made to this instruction is that it ignores the necessity for determining the proximate cause of the injury. Taken alone, the criticism may be well founded. But the charge must not be taken in sections, but as a whole. The jury had just been told in unmistakable terms that they must find "that such negligence produced the injury complained of," and again, "that such negligence was the proximate cause of the injury," before they could answer the first issue "Yes." We think his Honor fully explained the doctrine of proximate cause, so as to leave no misapprehension in the minds of the jury. The other objection is by no means trivial. It relates to the words, "that the plaintiff was deaf does not make him an outlaw." We think the use of such

142—22

language in the prayer for instructions unfortunate, to say the least; but we cannot think when repeated from the bench that the jury inferred that his Honor was stating it to be his opinion that defendant had treated plaintiff as an outlaw. We do not place any such construction upon it, and we do not believe the jury did. The charge which preceded this particular instruction was so clear, fair and impartial in its general tenor that we are sure the jury did not receive the impression that the Judge was so hostile to defendant as to intimate an opinion that it was treating plaintiff as an outlaw. While it was not well advised in the Court to have adopted such language, under all the circumstances we do not think it necessitates a new trial on that ground.

Another prayer of plaintiff given and excepted to is as follows:

"That if the jury find from the evidence that the defendant company was operating the train which injured the plaintiff in violation of an ordinance of the city of Wilmington, and that it did not have a man on the end of the car approaching the crossing, as required by said ordinance, then this alone is a sufficient circumstance from which the jury may infer negligence on the part of the defendant, and to justify them in answering the first issue 'Yes.' "

It is insisted that this instruction contravenes the rule laid down in *Smith's case,* 132 N. C., 824, and *Duval's case,* 134 N. C., 332, where it is held that running trains through cities and towns at a greater speed than is allowed by the municipal ordinances is some evidence of negligence to be submitted to the jury. The ordinance of the city of Wilmington requiring that the railroad company shall have a man on the end of a car approaching this crossing is an affirmance of the general law of the State. It did not declare anything to be law which was not already in force. In giving this instruction the Court did not tell the jury that a violation of a city ordinance was *per se* negligence, but that the jury might

infer negligence from the circumstance that no man was on the end of the car. This was substantially what the Court had already charged, and the giving of this further instruction was unnecessary and harmless. It is true, in this portion of the charge there is no reference to proximate cause, but we repeat that the charge must be taken in its entirety and not in "broken doses." It is unnecessary to lengthen this opinion by considering in detail the prayers of defendant upon the issue of contributory negligence. Most of them are substantially given in the charge of the Court, and many of them were given *verbatim*. In instructing upon this issue his Honor was eminently just to defendant, and applied the law applicable to the differing phases of the evidence with clearness and accuracy. We discover no error in any instruction he gave or omitted to give as to contributory negligence.

After charging the jury fully and correctly as to actual or compensatory damages, the Court, at request of plaintiff, gave the following special instruction:

"In considering the question of damages, and in the attempt to reach the amount which the jury will award, if they are satisfied by the evidence that the plaintiff is entitled to any damage, they may take into consideration the question whether the injury was due to such negligence which amounts to a little more than an accident, or such negligence that shows wanton disregard of the rights of the plaintiff; and if they should find in this case that the conduct of the defendant has been such as to indicate a reckless disregard of its duty to the plaintiff, they may, if they feel disposed, increase the allowance of damages for that reason."

This is an instruction that plaintiff is entitled to recover punitive damages in some phases of the evidence, and is erroneous. There is no allegation in the complaint, and no evidence that the injury was wilfully, wantonly and recklessly inflicted in utter disregard of plaintiff's rights. There is nothing in the facts of this case to bring it within the

WILSON v. RAILROAD.

principles laid down in *Holmes v. Railroad,* 94 N. C., 318, cited by plaintiff. Neither is *Purcell's case* any authority for awarding punitive damages to plaintiff. That case was overruled in *Hansley's case,* 115 N. C., 603, and reinstated upon a rehearing of same case, 117 N. C., 570, upon another ground than that given in the original opinion, viz., that Purcell was treated with indignity and contempt in rushing by the station when there was room for passengers on the train. In actions *ex delicto* the motive of the defendant becomes material. If a tort is committed through mistake, ignorance, or mere negligence, the damages are limited to such as are called compensatory or actual. 1 Sutherland on Damages, sec. 373; 5 Am. and Eng. Enc. (1 Ed.), p. 21, where the authorities are collected. *Railroad v. Arms,* 91 U. S., 489, and the elaborate opinion of *Mr. Justice Avery* in *Hansley's case,* 115 N. C., 605.

It is contended that the Court finally instructed the jury that punitive damages should not be allowed in this case, in that the record disclosed that "At the conclusion of the whole charge, counsel for plaintiff asked if the Court would not charge that the plaintiff could recover punitive damages, and the Court said it would charge the jury that they must not allow punitive damages."

As we have held, his Honor instructed the jury in the previous part of his charge practically that punitive damages might be allowed. If he intended this as a correction of the former part of his charge, it was his duty to have called the attention of the jury to it as a correction. It would seem from this colloquy between Judge and counsel that both thought that the Court had not already instructed practically that the jury could award exemplary or punitive damages. The Court ought to have defined what is meant by punitive damages, for as it is a technical legal term, the jury might not have considered that his Honor had already charged in effect that they could award them. So we think that,

notwithstanding what the Court stated at the conclusion of the charge, the jury might have felt at liberty to go beyond compensatory damages under the authority of what had been previously said. They had a right to suppose that if his Honor intended to correct his charge he would have called their attention to it as a correction.

The jury were, therefore, left at sea, between contradictory instructions upon the issue of damages, which, under numerous decisions of this Court, entitles the defendant to a partial new trial.

In *Edwards v. Railroad,* 132 N. C., 101, it is said: "It is well settled that when there are conflicting instructions upon a material point, a new trial must be granted, as the jury are not supposed to be able to determine when the Judge states the law correctly and when incorrectly."

*Edwards v. Railroad,* 129 N. C., 78; *Williams v. Haid,* 118 N. C., 481; *Tillett v. Railroad,* 115 N. C., 662.

Let one-half the costs of the appeal be taxed against the plaintiff and one-half against the defendant. It appears that unnecessary portions of the record were sent up at the plaintiff's request. It is ordered that one-third of the costs of printing the record and one-third of the costs of making out the transcript in the Superior Court be taxed against the plaintiff individually.

It is ordered that there be a new trial on the third issue.

Partial New Trial.

WALKER, J., concurring in part: I think it clear that an error was committed as to the issue of damages, in the respect stated in the opinion of the Court, and therefore concur in that opinion, and in the conclusion reached as to that issue. When the Court charged as to compensatory damages and then gave the instruction as to an increase in the allowance of damages by reason of a reckless or wanton disregard of plaintiff's rights, it plainly referred to an enlarge-

ment of compensatory or actual damages, and the jury were well warranted in so construing the charge. Especially is this so, in view of the fact that counsel afterwards inquired if the Court would hold that the plaintiff was entitled to punitive damages and was told that it would not, and it so instructed the jury. This last instruction was not corrective or explanatory of the first, but was either in direct conflict with it, which would make it a reversible error under *Tillett v. Railroad,* 115 N. C., 662; *Williams v. Haid,* 118 N. C., 481; *Edwards v. Railroad,* 132 N. C., 99; or, if consistent with it, more surely evinced the Court's reference to actual or compensatory damages when, in the former instruction, it told the jury that they might increase the amount of damages if the defendant's conduct was more than merely negligent. The degree of negligence, if there are any degrees, could not, of course, enhance the actual damages.

I am fully convinced there was error in the charge relating to the first issue, and consequently that the new trial should be general. It must be remembered that the expression in the charge, namely, "the fact that the plaintiff was deaf does not make him an outlaw," was used, not by counsel in argument, but by the Court in direct response to plaintiff's request for instructions. In *State v. Horner,* 139 N. C., 603, a similar remark was made by the Solicitor in his address to the jury when referring to the lawless acts of the defendant. This Court clearly intimated that, if the word "outlaw" had been used in its ordinary or legal sense, and the effect upon the jury of such an abusive epithet had not been counteracted by the Court, a new trial would have followed. But the Solicitor explained that he merely meant to describe the defendant as one who had put himself beyond the reach of the law's process by avoiding arrest, and the word was not used in the sense that he had put himself beyond the pale of the law and forfeited its protection, as in the case of a fugitive from justice for whom proclamation has been made

and who may be slain, if he refuses to surrender, by any citizen without accusation or impeachment of crime. Revisal, 3183. This Court, in view of the Solicitor's explanation, and of the charge of the Court that the evidence in its most favorable light made the defendant guilty of manslaughter, of which offense he was convicted, held the remark to be harmless, or at least not "grossly or manifestly prejudicial." - But it is also said, in that connection, that the use of any term of reproach, especially in regard to a party to the cause, is not commended, and the clear implication is that but for the explanation of the Solicitor and the charge of the Court, the use of the term "outlaw" would have been good ground for a new trial, the defendant having duly objected to its use. Here the objectionable language is employed *by the Court,* and the fact that it was done at the instance of one of the parties does not neutralize its effect, but rather intensifies it. The logical, if I may not say the inevitable, implication from its use is that the defendant had treated the plaintiff as one who had been deprived of the benefit of the law or excluded from its protection, which is the ordinary and accepted meaning of the word "outlaw." The fair deduction from the remark of the Court is that though he was deaf the plaintiff had certain rights, which the defendant had ignored, and that instead of recognizing them, it had treated him as an outlaw. It was also the intimation of an opinion that the defendant had acted towards the plaintiff as if he were an outlaw. It was not a direct charge that it had done so, but there is no escape, I think, from such a construction of it, and it is just as harmful as if the accusation had been made in so many words. It conveys but the one meaning. I do not say merely that I think his Honor did not intend so to use the words, but that I know he did not, and I know that counsel did not appreciate, at the time, the force and effect of the language employed in the instruction. Neither Judge nor counsel would advisedly

use the expression. It was an inadvertence—a mere slip. But, nevertheless, it had the baneful effect, or may have had it, all the same, and we must look, not at the motive in giving the instruction, but at the probable prejudice actually resulting from it, or that may have resulted from it. We should be careful in the trial of causes to see, not only that parties receive a fair and impartial hearing, but we should give them no reasonable ground to complain that justice has been denied them. There is nothing so calculated to make the "wavering balance shake," as when a remark falls from the Court, though casual or accidental, and unintentional, which even constructively imputes wrong to either side. The slightest intimation from the Court is sufficient to turn the scales against either litigant, and hence our statute, which forbids even a suggestion from the Court upon the facts. We must consider the instruction as it is, and not as it was intended to be. If the objection to this part of the charge is "by no means trivial" and "the language is unfortunate," how can we say that it may not have influenced the jury and turned the scales against the defendant?

My opinion, also, is that there was error in giving the third of the plaintiff's prayers, it being the one fully set out in the opinion of the Court, and which refers to the violation of the city ordinance. The Court thereby instructed the jury that a violation of the ordinance *alone* was sufficient to justify them: 1. In inferring negligence, and 2, in answering the first issue "Yes." In other words, that the violation of the ordinance was a circumstance which, standing by itself, justified them in giving an affirmative answer to the first issue. This goes beyond all of our precedents on this subject, and is, I think, plainly in conflict with them. It has always been held that the violation of an ordinance was merely evidence of negligence, and not negligence *per se*. The effect of this instruction is to make it negligence *per se* or negligence, without reference to any inquiry as to whether it proximately

caused the injury or not or as to whether there was any causal connection between the violation of the ordinance and the injury. If there was a violation the jury need go no further, but may stop there and answer the first issue "Yes." This instruction eliminated the element of proximate cause, and the error thus committed was not corrected by anything the Court charged generally upon the subject afterwards, for the use of the word "alone" necessarily so restricted their inquiry as to render the other instructions wholly inapplicable. There is another objection to the instruction. It excludes from their consideration the evidence in regard to the flagman, who, it is alleged, was walking in front of the moving car. No case requires absolutely that a watchman should be on the end of the car. If there is one walking in front of it, so much the better for the safety of pedestrians and others crossing the track, and this is, in law, an equivalent for the presence of a lookout on the top, or on a foot-board in front, of the car. I say it excludes this evidence from the case, because the jury are told that the violation of the ordinance alone, and if alone, necessarily without reference to other testimony making in defendant's favor, will warrant a verdict for the plaintiff upon the question of negligence. Therefore, I concur in the opinion so far as it awards a new trial on the issue as to damages, but dissent from the view of my brethren that the defendant is not entitled to a new trial without restriction, and for the reasons I have stated.

As regards the crossing in question, it is a very dangerous one, if the evidence is credible, and the vigilance of the defendant should be proportioned to the danger. From the situation as now presented, it may well be argued that the defendant is bound to extraordinary care in the protection of the public while crossing its tracks at that place, but whether it has used the care in this particular instance which was required of it is a mixed question of law and fact, its lia-

bility depending upon the application of well-established principles in the law of negligence.

CLARK, C. J., concurring: In *State v. Horner,* 139 N. C., 603, counsel for the State referred to the defendant as an "outlaw." This was held not to be ground for a new trial. Here the Judge charged at request of plaintiff that the plaintiff was not an outlaw. Certainly the defendant cannot be hurt thereby. He does not contend that the plaintiff was outlawed.

If there was an incorrect intimation in the charge that the plaintiff could recover punitive damages, this was corrected after the charge was concluded, by the Judge refusing such prayer when asked by the plaintiff, and the express charge given that the plaintiff could not recover punitive damages. This is not the case of contradictory instructions in the same charge. No intelligent jury could fail to understand that this was the final instruction of the Court. The jury are presumed to be competent and intelligent men—as competent in the discharge of their office of triers of fact as the Judge is taken to be in instructing them upon the law. If so, this last instruction of the Court, made after the charge had been concluded and in refusing a special instruction asked by the plaintiff, could not have failed to impress the jury that punitive damages could not be given by them. But is it entirely clear that the negligence of the defendant was not so gross as to amount to wilful and wanton neglect of duty? Was there not, indeed, criminal negligence on its part? The use of the public street by defendant in that mode had been so long persisted in, and was so glaringly dangerous, that it might well be that punitive damages would be required to prevent a continuance of the danger. The street had been laid out as such by authority of law. Its primary use, therefore, was for citizens on foot or in carriages. The defendant had a right to use it only subject to the primary right of the

public.   The defendant had 15 to 21 tracks, laid across this public street, most of which it used for shifting purposes, as it had five shifting engines there.   One or two tracks, perhaps, were used for carrying freight to the warehouse, or to vessels, at the wharf.   The defendant could, and should, have elevated the tracks it used for that purpose above the street, as it has done with the adjacent track used by it for passengers.

And the other tracks used for shifting purposes should have been moved farther out, to a shifting yard that would not be crossed by a public street which, by a decree of Court, has been laid out, as this street had been, for the use of the public.   The defendant added to its great negligence in maintaining at that point 15 to 21 tracks, crossing a public street on the same grade, not only by having no gates, but by having only one flagman for so many tracks, who could have been of no protection to the plaintiff at the crossing of a distant track.   Besides, the flagman who was stationed midway these 20 tracks signaled the plaintiff to go ahead, and he was struck by a flying switch, the cars running backward, without a lookout, and in violation of a town ordinance requiring a watchman on a board at rear end of the car 12 inches from the ground.

Such conduct by the defendant practically compels the citizens needing to use that street to take their lives in their own hands and to "run amuck."   It is a practical denial and reversal by the defendant of the decree of Court which dedicated that street primarily to the use of the public.   The street thus crossed by so many tracks leads to the depot of the S. A. L. Railway, and was greatly used by the public, both for passengers and in hauling freight, and for the ordinary passing to and fro of the public.

When the defendant's track was laid out, some seventy years ago, population and business were small, and the revenues to the company were light.   It was not dangerous at that time to lay the defendant's track on a level with the public street, nor did the defendant then have 15 to 21

tracks at this point. The railroad companies must take notice that with the great increase of population and of their traffic it has become criminally negligent to continue to cross on a grade at points where the number of those crossing and their own numerous trains make the use of the street or crossing dangerous to the public. Wilmington now has over 30,000 people, and in the near future will doubtless have 100,000 or more. The use of one of its public streets can not be interfered with by 15 or 21 railroad tracks with constantly moving cars and engines. The people of the city have a right to use their streets with safety. The defendant has no right there except in subordination to the prior right of the citizens to the use of the streets. The defendant should remove its shifting tracks and place its other tracks above the street. This must necessarily be done sooner or later, and it is questionable whether it is not criminal negligence for railroads to fail to change their tracks and run above or below the roadway at such places as this. Last year the railways in this country killed, according to the published official reports of the United States Government, nearly 10,000 people, and wounded or crippled nearly 90,000 more—a total of nearly 100,000 killed and wounded in one year. So far as this vast amount of suffering and misery can be reduced by proper care—and the relative number killed and wounded in foreign countries is very far less—it is the duty of courts and juries to see that a neglect to do so is properly punished.

Throughout Europe railroads are very rarely permitted to cross a public road, even in remote country districts, and never in or near a town. In Connecticut, Massachusetts, and to some extent in New York, railroads have been compelled by statute to change their tracks so as to pass always above or beneath roads and streets used by the public, and to make the change, of course, entirely at their own expense. Such statutes have been held constitutional not only by the courts of those States, but by the Supreme Court of the Union.

*Railroad v. Bristol,* 151 U. S., 556; *Railroad v. Kentucky,*
161 U. S., 696; *Railroad v. Defiance,* 167 U. S., 99;
*Wheeler v. Railroad,* 178 U. S., 324; *Railroad v. McKeon,*
189 U. S., 509. See cases from State courts cited 140
N. C., at p. 229.

Now that their attention has been called to it, doubtless
these great corporations, with their great and abundant reve-
nues, derived from the public, and with their constantly
increasing number of trains, will feel moved by considerations
of humanity, as well as by their own interest, to abolish grade
crossings at such places as this and at all others where their
longer retention will be inconvenient or dangerous to the
public.