WALKER and CONNOR, JJ., dissenting.
The evidence tends to show that the deceased was a deputy sheriff and had a warrant for the arrest of the prisoner for carrying concealed weapons. Deceased approached prisoner for the (742) purpose of effecting his arrest, and some conversation ensued, the prisoner finally agreeing to give bond for his appearance. The prisoner, the deceased and others started to the office in the feed store of one Engel for the purpose of signing the bond. Hilton, the deputy sheriff, sat down at the table to write the bond, and while thus engaged the prisoner escaped from the room, Hilton following to capture the prisoner, and in the altercation which followed, the prisoner shot and killed Hilton.
In one of their briefs the prisoner's counsel admit that if the decision in S. v. Horner, 139 N.C. 603, is to be adhered to, all their exceptions are untenable except the fourth; and as to that exception it is insisted that the court below erred in charging the jury that in any view of the evidence the defendant was guilty of manslaughter, thereby depriving him of his plea of self-defense. In the able argument of Mr. Dean, as well as in their well-considered briefs, counsel for defendant endeavored to draw a distinction between the case at bar and Horner's case. After most careful consideration, we fail to see the distinction. In fact, the cases appear to be "on all-fours."
The deceased, Hilton, was a deputy sheriff and had arrested the prisoner upon a warrant for carrying a concealed weapon — a misdemeanor. The defendant, according to his own evidence, recognized Hilton's authority and went with him to give bond for his appearance. When they arrived at the office the deceased commenced to write the bond. As to subsequent occurrences the defendant testified: "Hilton then sat down and got to writing, and while he was doing so I slipped out of the side door of the store, and after I had got about twenty yards, I looked back and saw Hilton coming with his pistol in his hand, coming towards me. I was running and he was running. I ran on about five or ten *Page 568 
(743) steps and looked around and saw Hilton with his pistol pointing towards me. Up to this time I had not drawn my pistol. I then drew my pistol and continued to go forward sideways, holding my pistol pointing in the direction of the left side (describes attitude). The range of the pistol was not on Hilton. I looked around as I was going away, and as I did so he fired on me. I then turned and fired. I did not aim at him this shot. I did not attempt to hit him. I did not want to hit him this shot. When I fired the first shot I came to a little stop — a moment's stop. I then went two or three steps and Hilton shot again and the bullet grazed me on the left arm. I then fell back a little bit — standing against a little sapling. Up to this time Hilton had fired two shots and I one, and after this he fired two more before I fired any more. I then fired one and killed him. At the time I fired the last shot Hilton was standing up aside of a sapling, his pistol pointing at me. After the last shot I ran off and went home."
The defendant further testified that when Hilton arrested him he laid hands on the defendant and said, "Give me your gun"; that he had a pistol in his pocket and did not give it up or allow Hilton to search him; that he had a bottle of liquor in his right hip pocket; that he fired on Hilton and killed him because he thought Hilton would kill him, and that Hilton ordered him to stop as he ran off. One Kuy Kendall corroborates the defendant, but states that he never saw the defendant when he drew the pistol, and never saw it until the defendant turned and fired. This is not necessarily inconsistent with the defendant's statement.
We have stated only the material evidence offered by the defendant and most favorable to him, because in passing on this exception that testimony alone should be considered. The facts in Horner's case, briefly stated, are that Nichols, a deputy sheriff, had a warrant for (744) Horner for a misdemeanor, viz., whipping his daughter-in-law. Horner refused to submit to arrest and attempted to escape. The testimony most favorable to Horner was his own (139 N.C. 610): "I was in the woods; dog had treed a squirrel; Nichols and Breez came on down the road. Nichols called to me and I answered. He said, `Come on and go with me'; had a warrant; he read it. I said I am not going to do it; he said if I would promise to be at Squire Terry's tomorrow at 3 o'clock, he would go. I refused. He came on me and said to me with an oath, `If you do not go with me I am going to shoot you.' Then I picked up gun and walked off; he shot at me; I ran about 50 yards; he shot again and I threw gun `round and shot; I was going away from him; was out there for a squirrel. I ran against a tree when he was after me — knew deceased was a deputy sheriff." Horner was convicted of murder in the second degree and appealed. His Honor had instructed the jury, *Page 569 
as in the case at bar, that Horner was guilty of manslaughter at least. In almost every respect the cases are similar.
Ever since S. v. Garrett, 60 N.C. 145, it has been thought that in this State the principle of self-defense does not apply to the case of one who places himself in the posture of armed defiance to the process of the State. In that case the Chief Justice says: "When a man puts himself in a state of resistance and openly defies the officers of the law, he is not allowed to take advantage of his own wrong, if his life is thereby endangered, and to set up the excuse of self-defense." The law of self-defense, applicable to encounters between private persons, does not arise in the case in which a person sought to be arrested kills the officer seeking to make the arrest. In this State, we think this is most essential to "preserving good order and asserting the supremacy of the law." After mature consideration, this rule was reaffirmed in Horner'scase by a unanimous Court. The well-considered opinion delivered by Mr.Justice Connor is not open to any possible misconstruction so far as we can see. Much of his language would apply with aptness to this case. The learned justice says: "The prisoner knew that the deceased was a deputy sheriff and that (745) he had a warrant for his arrest. It was his duty to submit to arrest, and in resisting it with a gun in his hand it is not open to him to say he acted in self-defense. Conceding that as he (the prisoner) was going away from the officer, refusing to submit to arrest, the officer was not justified in shooting him to make the arrest, does not affect his right to kill. If there was a necessity to shoot the deceased to save his life, it was the result of his unlawful act in resisting the mandate of the law. The position of the prisoner is similar in this respect to one who brings on or provokes a difficulty, and in the progress of it kills. It is not se defendendo, because he brought on the necessity. This is elementary and uniformly sustained by numerous cases in our own and other jurisdictions."
The officer is not excused if he, with undue violence, menaces the life of the defendant when he attempts to arrest a person for a misdemeanor. The officer may be convicted and punished. But his crime will not excuse or condone the crime of the defendant in making open resistance to the process of the State. We are aware that in some jurisdictions it is held otherwise, and that while an officer, in attempting to arrest for a misdemeanor, dangerously menaces the life of the accused, the latter may defend himself to the extent of taking the officer's life, and the plea of self-defense is open to him. But in this State we have a statute (Laws 1889, ch. 51) which enacts that "any person who willfully and unlawfully resists, delays, or obstructs a public officer in discharging or attempting to discharge a duty of his office shall be guilty of a misdemeanor." At the time he killed the deceased the defendant was engaged in an unlawful *Page 570 
act, not only malum in se (being in armed resistance to the process of the State), but an act directly connected with, and which finally resulted in the death of the officer; for it is plain that had the defendant (746) himself not resisted the law but submitted to arrest, there would have been no homicide by any one. S. v. Hall, 132 N.C. 1094;S. v. Turnage, 138 N.C. 566; Wharton Cr. Law, vol. 1 (10 Ed.), sec. 305. There is
No error.