STATE v. CLEVE DANIELS.

(Filed 12 November, 1913.)

1. Trials—Continuance—Court's Discretion.

The refusal of the trial judge to grant a continuance of a case because of the absence of a witness is a matter within his discretion, and not reviewable on appeal unless this discretion has been abused; and where the trial is for murder in the first degree, and defended upon the theory that the prisoner was under the influence of a drug, at the time, which rendered him incapable of premeditation, and no evidence thereof has been offered, though it appears that opportunity under the circumstances was afforded, the refusal of a motion to continue for the absence of a witness to testify as to this fact is not reviewable.

2. Homicide — Murder — Premeditation — Evidence—Questions for Jury.

Where there was evidence that the prisoner immediately before the homicide went up to a group of negroes, among whom

was the deceased, and said, "What did you say, old nigger?" repeated the remark, after a silence, whereupon the deceased asked him to whom he was speaking, and the prisoner replied with an oath that he was speaking to him, the deceased, saying further, "I don't like you, nohow, and what it takes to kill you I got it," and then took a pistol from his pocket, fired twice at the deceased, snapping empty cartridges several times, the firing causing the death; that the prisoner after the homicide expressed a regret that he had not had another shot at the deceased; and there was no evidence that the prisoner at the time was drunk or under the influence of a drug, it is held sufficient upon the question of deliberation and premeditation for conviction of murder in the first degree. *S. v. McCormac*, 116 N. C., 1036, cited, approved, applied.

APPEAL by defendant from *Bragaw, J.*, at May Term, 1913, of DURHAM.

This is an indictment for murder, and the prisoner, being convicted of murder in the first degree, appealed from the sentence of death.

The prisoner moved for a continuance on account of the absence of Richard Cash, who was with the prisoner before and at the time of the killing, and by whom he expected to prove that he was under the influence of cocaine to such an extent that he was incapable of premeditation and deliberation. The motion was overruled, and the prisoner excepted.

The deceased, Jim Dunnegan, was killed in the daytime in the city of Durham, on 26 January, 1913.

Ed Cain, offered by the State, testified: "Was living, in January, 1913, on Glendale Avenue in the northern part of the city of Durham; knew Cleve Daniels and Jim Dunnegan. Had known them for ten or fifteen years. Jim Dunnegan is dead; was shot. Saw the shooting take place on Sunday; thinks deceased died on Monday morning. Went to the burial. Shooting took place about 50 yards from my house on Glendale Avenue. I was about 10 feet from them. Was standing up against a tree on that street before the shooting. Garland Smith, Aaron Hobbs, and Joe Hayes were with us. Saw Jim Dunnegan and

164—30

Robertson coming up from Corporation Street, coming towards where I was standing. They stopped and went to talking. These two joined us and made six of us there in all. Cleve Daniels and a white fellow named Cash was on Geer Street at a house called Agnes Leathers', about 40 or 50 yards from where I was. Cleve Daniels went to Agnes Leathers' house, and afterwards he came to where we were standing. When he came up, Cleve Daniels says: 'What did you say, old nigger?' Never spoke to any one particularly; was talking to the whole crowd, and no one gave him any answer, and he said so a second time, 'What did you say, old nigger?' Jim Dunnegan asked him who he was talking to, and he said: 'I am talking to you, damn you. I don't like you, nohow, and what it takes to kill you I got it.' He pulled out his pistol and fired, and Jim moved his leg like that; and he shot again, and by that time Jim grabbed his hand. He took his pistol out of his pocket and pointed it right level at Jim Dunnegan. Don't know whether he hit him the first time or not; knew he hit him on the second time, because Jim Dunnegan said so, then grabbed him. The shot hit him somewhere about the abdomen in the direction the pistol was pointed. It was a black pistol. I think a Smith & Wesson. [Identifies the pistol, which is here offered in evidence.] Nothing had been said between Jim Dunnegan and Cleve Daniels before Daniels stepped up and asked the question, 'What did you say, old nigger?' Jim Dunnegan had been with me about five minutes before Cleve Daniels came up. After the second shot, Jim Dunnegan grabbed Cleve Daniels by the wrist, and after he caught his wrist he snapped three more times, but the pistol failed to go off. Jim Dunnegan did not have any weapon, only he took the pistol away from Cleve Daniels in the struggle. Afterwards Cleve Daniels got up and went down to his house about as far as from here to the back side of the courthouse. Jim Dunnegan lived on Corporation Street, about as far as from here to the corner of Roxboro Street. The only other words spoken were, Aaron Hobbs, Cleve Daniels' brother, said to Jim Dunnegan, 'He has shot you once; why don't you beat hell out of him?' Jim Dunnegan did

not do anything after he got Cleve Daniels down and struck him two or three times. Jim Dunnegan did not get his hand on Cleve Daniels until after the second shot was fired; they were about 6 feet apart then. Jim Dunnegan had both hands in his pocket. Cleve Daniels got the gun from back here somewhere [indicating his hip pocket]. He had on an overcoat. Don't know whether he got it out of his overcoat pocket or his hip pocket. When Cleve Daniels walked up, he said, 'What did you say, old nigger?' and didn't anybody say anything to him, and then he spoke a second time, and said, 'What did you say, old nigger?' and Jim Dunnegan said, 'Who is he talking to?' and Cleve Daniels said, 'I am talking to you, God damn you; I don't like you, nohow, and what it takes to kill you, I got it.' Then he drew his pistol."

Cross-examination: "The oath was not supplied. He cursed when he told Jim Dunnegan he did not like him, nohow. I told it at the trial before. I don't know that I told that before. I know he cursed. Know there was a damn in the oath. Pistol was aimed at Jim Dunnegan, and the shots were bam, bam— just like that; in the same direction both times. Jim Dunnegan did not catch hold of Cleve Daniels' hand after the first shot; did not tell that downstairs. Pistol was pointed in the same direction both times, one shot right after the other, and the range of the pistol was not changed between the shots; pointed both times at Jim Dunnegan; fired twice, and if both bullets left the pistol, it hit him both times; did not swear downstairs that Jim Dunnegan ran to Cleve Daniels and said, 'Look! the negro shot me,' and grabbed him by the hand as he shot the second time. After he shot the second time, Jim Dunnegan grabbed him. They had had no trouble at all, that I know of. Don't remember that he said, 'What did you say when I passed here before?' He went by the first time with Mr. Cash, but Jim Dunnegan was not there; only me, his brother, Garland Smith, and Joe Hayes were there. Jim Dunnegan wasn't there. Don't know how long it was from the first time he went there until he came back. When Cleve Daniels first came by there, Jim Dunnegan wasn't there, and Aaron had two dogs playing

or fighting, and Cleve Daniels came by there and asked Garland Smith about the dogs, and told him he would get him when he came back, and Jim Dunnegan wasn't anywhere about there. He did not have any words before with Jim Dunnegan. There was no trouble with Smith, only Cleve Daniels told Garland Smith he would fix him when he came back down there. Don't remember the exact words; he told him something about fixing him, damn him, when he came back. Don't know what Cleve Daniels' condition was. He did not look drunk to me. He did not look like he was under the influence of morphine or cocaine. He looked like he always looked. I have not had any trouble with Cleve Daniels; just had fusses like negroes always do. I did not dislike him. We are just as much friends as we always were. Did not have any trouble the day before that; had just cut his hair on Saturday. I was over to his house on that Saturday. I have been up for taking money away from Jim Strudwick and fighting seven or eight times. Did not get mad with Cleve Daniels the day I cut his hair. Cut his hair on Saturday."

Redirect: "When Cleve Daniels passed by, Mr. Cash was with him, and went about as far as from here to the station-house before he came back. They were walking along."

Bud Robertson, another witness, testified to substantially the same facts.

Mary Holman, a sister of the deceased, testified that she went to the home of the prisoner after the shooting; "that Cleve Daniels was standing on the porch with his wife, Bedie, as I walked up, and said, 'Cleve Daniels, what did you shoot Jim Dunnegan for?' and he said, 'I have not shot no damn Jim.' And I looked up and saw Mr. Stone and another man, and I said, 'There comes the policeman now.' At that time Cleve Daniels shot out of the door and went through the front door and out of the back door, and tried to get over the fence. I saw him after they arrested him, and he said he wished he had gotten one more damn shot at the Dunnegan nigger."

The prisoner requested his Honor to charge the jury that there was no evidence of premeditation and deliberation, which was refused, and he excepted.

*Attorney-General Bickett and Assistant Attorney-General Calvert for the State.*

*J. C. L. Harris and Manning, Kitchin & Everett for defendant.*

ALLEN, J. We have given careful consideration to the entire record, and find no error in the proceedings in the Superior Court. The motion for a continuance was addressed to the discretion of the court, and the ruling of his Honor, denying the motion, is not reviewable, unless there has been an abuse of discretion, and we find none.

The killing was on the streets of Durham, in the daytime, in the presence of several witnesses, and immediately before the shooting the prisoner was at the home of Agnes Leathers, and just after was at his own home with his wife.

No evidence was offered by the prisoner, and nothing was developed upon the examination of the witnesses for the State indicating that the prisoner was not in full possession of his faculties.

His Honor was, therefore, fully justified in concluding that, if the prisoner was under the influence of cocaine at the time of the killing, as he alleged, he could prove the fact by other witnesses, and that he was not dependent upon the evidence of Bud Cain, a fugitive from justice, who might never return.

There was, in our opinion, sufficient evidence of premeditation and deliberation to sustain a conviction of murder in the first degree.

The absence of provocation, the preparation of a deadly weapon, the language used before the killing, "I am talking to you, damn you; I don't like you, nohow, and what it takes to kill you, I got it," and after, "that he wished he had got one more damn shot at the Dunnegan nigger," are circumstances tending to prove premeditation and deliberation, fit to be considered by the jury, and this evidence was submitted to them in a clear charge, which fully protected the rights of the prisoner.

In *S. v. McCormac,* 116 N. C., 1036, the Court says: "While premeditation and deliberation are not to be inferred as a matter of course from the want either of legal provocation or of

proof of the use of provoking language, yet all such circumstances may be considered by the jury in determining whether the testimony is inconsistent with any other hypothesis than that the prisoner acted upon a deliberately formed purpose. *S. v. Fuller,* 114 N. C., 885. Kerr (in his work on Homicide, sec. 72) says: 'The question whether there has been deliberation is not ordinarily capable of actual proof, but must be determined by the jury from the circumstances. It has been said that an act is done with deliberation, however long or short a time intervenes after the intent is formed and before it is executed, if the offender has an opportunity to recollect the offense.' The test is involved in the question whether the accused acted under the influence of ungovernable passion, or whether there was evidence of the exercise of reason and judgment. The conduct of the accused just before or immediately after the killing would tend at least to show the state of mind at the moment of inflicting the fatal wound. In passing upon the question whether the facts in a given case are sufficient to show beyond a reasonable doubt that the killing was done with deliberation and premeditation, while sudden passion aroused by provocation that would neither excuse nor mitigate to manslaughter the killing with a deadly weapon, is sufficient, if the homicide is committed under its immediate influence, yet the want of provocation, the preparation of a weapon, proof that there was no quarreling just before the killing, may be considered by the jury, with other circumstances, in determining whether the act shall be attributed to sudden impulse or premeditated design."

This case has been approved in *S. v. Lipscomb,* 134 N. C., 694; *S. v. Daniel,* 139 N. C., 552; *S. v. Stackhouse,* 152 N. C., 808, and in other cases.

The judgment must be affirmed.

No error.