STATE v. ROBAH BAITY AND SPENCER McNEILL.

(Filed 15 December, 1920.)

**Homicide—Murder—Premeditation—Evidence—Questions for Jury—Motions—Nonsuit—Trials.**

The evidence of the element of deliberation and premeditation, which are essential to a conviction of murder in the first degree, is sufficient, if shown to exist for however short a time preceding the homicide; and

where the evidence tends to show that some one had given previous warning, with answering call, as the sheriff approached an illicit still in operation, and the sheriff was shot and killed by the defendant while being taken into custody, who watched the approach of the shreiff across a clearing, and stood with pistol in hand, ready to shoot, together with the defendant's declaration made some time previous, in a joking manner, that if he were blockading and an officer interfered "he would shoot his way out," is sufficient for a conviction of murder in the first degree, and defendant's motion of nonsuit should be denied.

APPEAL by defendant from *Harding, J.,* at May Special Term, 1920, of YADKIN.

This is an indictment for murder. The defendant was convicted of murder in the first degree, and from the judgment upon such conviction appealed to this Court. Spencer McNeill was tried with the defendant, but the jury acquitted him. The deceased was J. E. Zachary, sheriff of Yadkin County, and the killing occurred at an illicit distillery in Yadkin County. The State's evidence tended to show that Sheriff Zachary, on the night of 13 February, 1920, after summoning the witness, T. A. Caudle, to his assistance, went to the place of the illicit distillery, accompanied by the witness Caudle. When not far from the distillery they met a man who went some little way, then turned around and followed them, then he passed them, went out of the road a little piece and turned through the field, going parallel with them in the direction of the distillery. When they stopped, this man came down on the bank of a small branch and whistled several times, and the whistling was answered from the distillery. The distillery was located on the right side of this branch. After the man on the bank whistled, they went on again to the distillery, which was close enough for any one there to have heard the whistling. Caudle, continuing his testimony, said:

"The land is flat on the right-hand side of the branch; there are no trees in the bottom; the sheriff was going down on the south side of this branch; right next to the branch it is not so marshy as it is a little way out from the branch; it was marshy where the sheriff and I were going. I would think that the sheriff and I made considerable noise because we were miring and jumping from one place to another, trying to find some solid land. We saw Robah and Spencer McNeill at the distillery; when I first saw these men I would think we were twenty yards from the distillery. We were on the northwest side of the branch, which was the left-hand side as you go. I think it was something like twenty yards from the distillery when I first saw Robah Baity and Spencer McNeill; there was considerable light at the distillery; there were fence posts in the furnace and pine burned which made considerable light, and a lantern was sitting just below. The distillery was on the south side of

the branch; when I first saw them I am of the opinion that I was on the north side of the branch; the two men were standing in front of the furnace and were looking towards us; they did not change their positions from the time they saw us until we got there. There was nothing above the distillery, we were in plain view of the distillery; the branch near this distillery is in the form of an 'S,' in going down the branch we crossed one of these bends in the branch before the sheriff got to the men. The sheriff came down, stepped across the little branch where it makes a crook and took hold of the two men, like this, and said, 'Hold up; I've got you.' (Illustrates taking hold of coat lapel of each.) This man to my right is Robah Baity; I am taking the place of the sheriff; to my left Spencer McNeill. Now, Mr. Hayes, you raise your arm, left hand. In the position Mr. Hayes has his left hand Robah Baity's hand came up (hand up toward witness's shoulder). I heard a gun-shot, saw the flash, the light from the gun. The sheriff reeled back in this way (illustrating), and I stepped across the branch and into the branch and caught him as he started to fall.

"I was some ten or twelve feet from the sheriff when the shot was fired. I think the sheriff took hold of the right side of Baity's coat and I think he took hold of the left side of McNeill's coat. I think the two men were standing something like six or eight inches above the sheriff when he took hold of them."

Dr. S. A. Hardy testified that he saw Sheriff Zachary's body about one o'clock in the morning. The wound penetrated his right shoulder, just below the clavicle, and ranged in the direction of his heart. It penetrated the heart or one of the large blood vessels and caused his death. He said that Baity, the defendant, was ambidextrous, worked with his right hand or left hand either; that the sheriff was about 5 feet, 10 or 11 inches tall; that "A bullet entered below the collar bone and lodged somewhere on the left side; the ball went in at the right side and angled across by about 45 degrees, penetrating the heart or large blood vessel."

Noah Norman testified that in the summer preceding the killing he heard the defendant make the declaration in a joking manner that if he were blockading and an officer interfered with him he would shoot his way out.

At the end of the State's evidence, the defendant moved for judgment as of nonsuit as to murder in the first degree. Motion overruled; defendant excepted.

*Attorney-General Manning and Assistant Attorney-General Nash for the State.*

*Jones & Clement and J. B. Craver for defendant.*

ALLEN, J. The motion for judgment of nonsuit is upon the ground that there is no evidence of deliberation and premeditation, which is a necessary and essential element in murder in the first degree.

In *S. v. Banks,* 143 N. C., 657, the following charge was approved: "In order to constitute murder in the first degree, the killing must not only be done with malice aforethought, expressed or implied, but it must be done with willful premeditation and deliberation, and all this must be shown beyond a reasonable doubt.

"Without willful premeditation and deliberation being thus shown, it cannot be murder in the first degree.

"The word 'willful,' when used in a statute creating an offense, implies the doing of the act purposely and deliberately in violation of law. The meaning of the word 'premeditation' is a prior determination to do the act in question. It is not essential that this intention should exist for any considerable period of time before it is carried out. If the determination is formed deliberately and upon due reflection, it makes no difference how soon afterwards the fatal resolve is carried out. An act is done deliberately when done in cold blood, and after a fixed design to do the act.

"No particular time is necessary to constitute premeditation and deliberation, and if the purpose to kill has been deliberately formed, the interval which elapses before its execution is immaterial."

It is also said in *S. v. Bynum,* 175 N. C., 780: "It has been repeatedly held by this Court that the deliberation and premeditation need not be of any perceptible length of time. *S. v. Jones,* 145 N. C., 466; *S. v. Banks,* 143 N. C., 652; *S. v. Daniel,* 139 N. C., 549.

" 'It is not essential in order to show *prima facie* premeditation on the part of the prisoner that there should be evidence of preconceived purpose to kill formed at a time anterior to the meeting when it was carried into execution. It is sufficient if the prisoner deliberately determined to kill before inflicting the mortal wound. If there were such purposes deliberately formed, the interval, if only a moment, before its execution is immaterial.' *S. v. McCormac,* 116 N. C., 1033, where it is also said, approving Kerr on Homicide, sec. 72: 'The question whether there has been deliberation is not ordinarily capable of actual proof, but must be determined by the jury from the circumstances.' "

The absence of adequate provocation, preparation of a deadly weapon, proof that there was no quarreling before the killing are circumstances tending to prove premeditation and deliberation (*S. v. Daniels,* 164 N. C., 464), and these and other circumstances were present in this cast.

The defendant was engaged in an unlawful act at the time, and the jury might well infer from the evidence that he was notified of the approach of the officers by some one who whistled as a signal; that he

heard the notice, because there was a response to it; that he had plenty of time and opportunity to escape and would not do so, preferring to stand his ground; that he heard and saw the officers when they were twenty steps away, and instead of leaving at that time stood with back to the still and pistol in hand; that he shot without a word, and for the purpose of killing, pursuant to his declaration in the summer to the witness Norman, "That if he were blockading and an officer interfered with him he would shoot his way out," and this would be evidence of a fixed purpose to kill formed prior to the act of killing which meets the requirements of the law.

The statement of Norman was competent under the authority of *S. v. Howard,* 82 N. C., 623, in which evidence of a declaration made by the prisoner twelve months before the homicide bearing upon the act of killing and the motive was admitted.

There are other exceptions in the record, which we have carefully examined, but they are without merit and require no discussion.

The charge to the jury was fair and accurate, and covered the different contentions of the parties.

The case itself is one of peculiar interest. On one hand, the sheriff of a county has been killed while in the performance of his duty, and it must be understood that the officers of the law will be protected, and that those who resist or interfere in the performance of their duties will be severely punished.

On the other hand, we have a mountain boy who volunteered before he had reached the age requiring him to respond under the Selective Draft Law, and who spent eleven months in France, and while there was in four battles. During this period he had to undergo strict discipline and training with but one thought and purpose, and that was to teach him to kill, and as expeditiously as possible. How far this training, which may be all he ever had, and his familiarity with blood and death while in service, have influenced this crime we cannot know.

We have, however, only to deal with the conduct of the trial in the Superior Court, and in that we find

No error.