The prisoner was indicted for the murder of Paul W. Johnson and was convicted of murder in the first degree. From sentence of death he appealed, assigning exceptions, which appear in the opinion.
The deceased lived in Raeford and had a farm in the county six or seven miles distant. The homicide occurred at the farm about 2 p.m., 12 August, 1927. F. P. Johnson, brother of the deceased, had a grist mill which was not very far from the prisoner's house. Early in the morning on the day of the homicide the prisoner saw the deceased at *Page 461 
the mill and went from the mill to Curtis's, thence to Gillis's in Cumberland, then back to Curtis's to get his wife, who had been there since Thursday. Meantime the deceased had returned to his farm. The prisoner and his wife on their return from the Curtis place were traveling in a two-seated open car. In going home they went by the farm where the deceased and Sam Stewart were doing some work about the barn. There the roads crossed, and the prisoner turned from the Puppy Creek Road into the Mail Road, stopped his car, and called to the deceased. As to subsequent events there is sharp conflict in the evidence. Henry Ray, who lived 100 yards away, testified for the State: "About 2 o'clock I was in the porch and I saw the car drive up there and turn off right there and stop. I looked down the road and I saw Mr. Paul Johnson come up to the car. He came up there, and he put his foot upon the running board and he talked to who was in there, but mind you I didn't know it was Hector Graham. He talked a few minutes about as long as I have been sitting here, I guess, and he took his foot off the running board and he sort of turned away — he was this way (illustrating), and he turned away, and I think they were done talking, and by this time the shooting took place, and Mr. Johnson turned, stumbled over that way, and he went over that way, and the car pulled out, and he went back there a few steps and he fell. I know he just fell — about the length of himself he fell — I think that. I heard two shots. When the shots were fired Mr. Johnson wasn't anywhere from the automobile. He had just passed the hind end of the car, going that way. The car was going that way, and he hadn't turned far enough from the car to be anyways from it. He hadn't been far from it; he hadn't been nowhere from it. He hadn't went nowhere from it; he didn't have time to go nowhere from it. Mr. Johnson went back that way as far as he did go. I don't know how he got down there, whether he just fell that far or whether he walked a little bit before he did fall. After a short while, I went up there to see where he was. He had disappeared out of my sight, and I went up there to see what, if I could discover where he was, and I seen him prostrated in the road there. He was just lying there, and I couldn't tell what condition he was in because I didn't have any reason to trouble unless some one with authority, like the doctor, to put hands to him or nothing at all. I discovered though that he was dead. There wasn't any fussing or loud talking or anything like that. There was not any fight of any kind. This was an open car. Had a top on it, but I don't recall whether it was a one or two-seated car. Just whenever the pistol shot then the automobile pulled out. The engine of that car stopped running when he stopped there." *Page 462 
Alice Campbell, a witness for the State, said: "I live on Raeford Road on the right side, going from Raeford, left side coming from Fayetteville. That is what is known as Raeford Puppy Creek Road. House is just short distance from road. I was home on 12 August, 1927. Was there about 2 o'clock. I saw Hector Graham and his wife pass there in an automobile. Hector was sitting on side of car next to my house. His wife on other side. Hector was driving. I was sitting on front piazza, just below my door, i.e., on side next to Raeford. I saw Mr. Johnson. He was at the lot. I knew he was in the lot, but I did not know at what point. I saw him when he was called out from the lot. Hector called him. He had just stopped. Car turned a little into the other road, but stopped. The engine of car was somewhere about the stump. I could not see driver of car when it stopped. I could see the other person in front sitting. The other person was Hector's wife. I could hear the engine of car to the house. If the engine of car stopped, I did not pay any attention to it. Hector called Mr. Johnson. I heard the Paul part; I don't know whether he Mr.'d him or not. Mr. Johnson went to car when Hector called. Mr. Johnson had his hands in his pockets. He went up the Mail Road to car. When he went up to car he put his foot on running board. I could see his shoulders. Could not see any part of him except his shoulders. I did not see anything happen. The next thing I heard happen, I heard pistol fire, and right after the pistol fired there was a little racket made, a noise like a child, and then another pistol fired; it was just all done right at once, almost. Pistol was fired at car. I could see Hector's wife all the time. I could not see her move. I could have seen her if she would have moved. I don't know whether Hector's wife shot pistol or not, but I did not see her move. Mr. Johnson came running, staggering back around the car and fell. Mr. Johnson wasn't at car any time before shot was fired — just a few minutes. I never could estimate time. There was nothing between car and my house to obstruct the view. Car drove off immediately after pistol fired; car was going when Mr. Johnson fell. I never heard any fussing at car. I never saw any fight. I never saw Mr. Johnson move from the position he was in at car until pistol fired. He was there, looking right at the car and them."
The prisoner testified in part as follows: "I knew Mr. Paul Johnson all his life. I know all of the family. I worked with his father. I had known Mr. Paul 27 or 28 years. Mr. Paul Johnson and me, nor any of his family, ever had any trouble. I never had any ill-feeling towards him or any of his family. I saw Mr. Paul Johnson on 12 August. I first saw him on that day at Mr. Fred Johnson's mill, early that morning. . . . I left Mr. Curtis's to go home, and going from Mr. Curtis's to *Page 463 
my home I must travel the Puppy Creek Road to the crossing of the Mail Road at Mr. Johnson's place, turn in at the Mail Road to go to my house. I did not know that Mr. Paul Johnson was at the farm until I got there. I did not expect to see him at all. When I saw Mr. Paul at the barn, I stopped to see if I could get some work from him and see if he wanted some corn. I had sold Mr. Fred sixteen to seventeen bushels of corn and I wanted to sell some more corn. When I saw Mr. Paul at the barn I stopped and called (Hey, Mr. Paul), and he came to the car immediately. He walked up on the left side of the car where I was sitting. My wife had a bag in the car, and when he came up to the car he asked what was in that bag. My wife replied, `I have been off working.' I had a walking stick in the car between the back of front seat and coat rack. Mr. Paul grabbed the stick and said, `I will learn you how to call me Paul ________.' Mr. Paul took the stick and began hitting me. He struck me side of the face and on the back of the head, and I grabbed the pistol and shot him. The reason I had the stick, I had hurt my foot and had been using the stick for a walking stick." Stick produced in court and identified as the stick Mr. Johnson had hit him with. Stick seasoned dogwood, about the usual size of a walking stick. "It was not broken before Mr. Paul struck me with it. He struck me right there, on that bone (indicating cheek bone), and made that big scar and he hit my head up there and up there (indicating about the head). I shot him while he was beating me. I wouldn't have done it for nothing. I was just knocked addled."
Q. Why did you shoot Mr. Johnson? A. "I don't know. I just naturally was addled. He knocked me and assaulted me with the stick, and I hardly knew what I was doing, and then whenever he hit me he knocked every bit of the water in me out."
Q. Did you stop there for the purpose of having any fight or altercation with Mr. Johnson? A. "Not a bit in the world. I never did have no difficulty; I liked them all. I never did have no trouble with none of them at all. That is the truth. I always liked them all. I worked with them all. When I left there I went home. It's a wonder I did not tear up the car going home. I didn't know what I was doing; I was hurting so bad. I did not stay at home no longer than to open the door and get out. I went to Fayetteville on Monday morning and surrendered to Sheriff McGeachy. I tried to make my way there before, but could not get there. A colored man by the name of Bell, who lives about nine miles from Fayetteville, carried me to Fayetteville. I went to his house and asked him to carry me to Raleigh or Fayetteville so I could surrender, and he carried me to Fayetteville. When I surrendered to Sheriff McGeachy my face and eye were swollen, and the sore and *Page 464 
bruises were on my face where Mr. Johnson struck me. The skin was broken." Witness at this time shows scar across his cheek bone to the jury. Scar about two and one-half inches long, straight across the cheek bone.
Laura Graham, the prisoner's wife, testified: "I was at Mr. Curtis's 12 August. Was there to help wait on his wife. My husband came there that day. I left there with him. When we left there we went down the highway leading towards Raeford and turned and detoured and came around by Mr. Johnson's mill, and Mr. Paul Johnson's farm. That was the only way we could travel going home. The main highway was under construction. I saw my husband when he came to Mr. Curtis's. He was driving a car. Did not see him have any pistol. While he was there did not say anything to him about having broken into my trunk and getting a pistol. Only thing I said to him, `I will be ready in a few minutes.' We then left there as soon as I could lay the baby down and give the lady some milk. In going from there home we would go by Mr. Johnson's farm. Saw Mr. Johnson when we passed the farm. He was at the shelter when I first saw him. My husband stopped the car and called Mr. Johnson. Mr. Johnson came to car on left side. My husband did not say anything to Mr. Johnson as he came to car. When Mr. Johnson walked up to the car, he reached over and looked into the car, and said, `What is in that bag there?' and I just said it was my bag where I had been off on some work. Mr. Johnson then says to my husband, `Did you call me Paul?' and Hector replied, `Yes, sir, I did; isn't that your name?' Mr. Johnson says, `You _____, don't you ever call me Paul any more,' and he grabbed the stick out of the car and struck him. This is the stick that he struck him with. The stick was standing behind the seat in the coat rack. Don't know how many times he struck him. It frightened me so, I threw up my hand and began crying. Was not looking at my husband when he shot him. I heard the shots; could not say how many, I was so frightened. The licks and shooting occurred at the same time. As soon as shooting occurred my husband drove off immediately. Didn't know when we left there how badly Johnson was hurt. We went direct home. Did not hear my husband make any statement about Mr. Johnson that day. Have never heard him make any threats against him. He always spoke nice about him to me. I did not know of any trouble between my husband and Mr. Johnson."
Dr. G. W. Brown, the coroner, testified that he had examined the body of the deceased and had found two wounds — one in the left hand, indicating powder burn, and the other between the second and third ribs half an inch above the base of the heart. Both were pistol wounds, and the latter was fatal. The deceased died instantly. *Page 465 
The evidence is voluminous, but the foregoing is sufficient to give the background of the legal propositions referred to in the charge. Other evidence is set out in the opinion. Testimony offered in corroboration, or in support or disparagement of character is omitted.
In the outset of his argument the prisoner impeaches the legal sufficiency of the verdict and judgment on the ground that the trial court was without jurisdiction to hear and determine the question of his guilt. The position is predicated on Article IV, sec. 11, of the Constitution. It is therein provided that the General Assembly may by general laws provide for the selection of special or emergency judges to hold the Superior Courts of any county or district when the judge assigned thereto, by reason of sickness, disability or other cause, is unable to attend and hold said court, and when no other judge is available to hold the same, and that such special or emergency judges shall have the power and authority of regular judges of the Superior Courts, in the courts which they are appointed to hold. Accordingly, the General Assembly at the session of 1927 passed an act authorizing the Governor to appoint four special judges, two from the Eastern and two from the Western Judicial Division, whose term should begin 1 May, 1927, and end 30 June, 1929. Judge Townsend was appointed one of the special judges from the Eastern Division and was thereby vested with "all the jurisdiction which is now or may be hereafter lawfully exercised by the regular judges of the Superior Courts which they are appointed or assigned by the Governor to hold." Public Laws 1927, ch. 206. On 5 May, 1927, Governor McLean assigned Judge Townsend to hold the term at which the prisoner was tried, reciting in the commission that "by reason of sickness, disability, or other cause, the regular judge assigned to hold said term is unable to attend and hold the same."
We find in the record a certificate, dated about a month after the trial had been concluded, that the resident judge had been "available to hold the court." This Court has jurisdiction to review upon appeal any decision of the courts below upon any matter of law or legal inference (Const., Art. IV, sec. 8); but it cannot consider a paper which, unrelated to the trial, purports upon its face to have raised an issue of fact after the adjournment as to the recitals set forth in the commission given the presiding judge. *Page 466 
At no time during his trial did the prisoner assail the validity of the commission; his challenge first appears in his assignments of error. In S.v. Hall, 142 N.C. 710, 713, it is said that jurisdiction is never applied to any question touching the existence of the court itself and is not conferred until the court designated to exercise it has been brought into being according to the mode prescribed by law. If it be granted that the prisoner intended to say, not that the court, if legally organized, had no jurisdiction of the crime, but that it was called and organized without authority of law, his position is none the more favorable. In holding the court Judge Townsend served in the capacity of a judge de jure; pursuant to constitutional and statutory authority he was in the exercise of his office as a matter of right. But if he had been judge de facto as defined in S. v.Lewis, 107 N.C. 967, his duties, discharged under color of a valid appointment, would have been conclusive, not as to the State perhaps (33 C. J., 971, sec. 101), but as to the public and the rights of third parties. In People v. Staton, 73 N.C. 546, the Court observed, "And we think it may now be considered as settled by our own decisions and by the English and American cases and by the text-writers, that there is no difference between the acts of de factor and de jure officers so far as the public and third persons are concerned." The result is that in any view of the case the prisoner's first exception must be overruled. Burke v. Elliott,26 N.C. 355; Gilliam v. Riddick, ibid., 368; S. v. Speaks,95 N.C. 689; S. v. Turner, 119 N.C. 841; S. v. Hall, supra; S. v.Wood, 175 N.C. 809; S. v. Montague, 190 N.C. 841.
The second exception relates to the testimony of the witness Evers. He said that about ten days before the homicide the prisoner had told him that the deceased "had had some talk about him, and he was going to get even with him." It is contended for the defense that these words do not import malice, and that without them there is no evidence of such malice as tends to establish premeditation and deliberation. The prisoner's declaration was in the nature of a threat; hence the testimony was not incompetent. In S.v. Foster, 130 N.C. 666, evidence of a threat made a month before the homicide was held admissible as tending to show malice and as "some evidence" of premeditation and deliberation. If the evidence was competent for any purpose there would have been error in excluding it. S. v. Burton,172 N.C. 939; S. v. Johnson, 176 N.C. 722; S. v. Baity, 180 N.C. 722;S. v. Vaughan, 186 N.C. 759.
Mrs. Doss Bowen was permitted to testify that a short time before the homicide the prisoner took a pistol from his pocket in her presence and in the presence of his wife, whereupon the latter addressing her husband remarked, "You broke in my trunk and got it." This was *Page 467 
objected to; but the objection was properly overruled. Although the wife is not a competent witness against the husband in the trial of a criminal action, her declarations made in his presence, and in the presence of a third party, and naturally calling for some action or reply if untrue, he remaining silent, are admissible in evidence. S. v. Record, 151 N.C. 695;S. v. Randall, 170 N.C. 757, 762; S. v. McKinney, 175 N.C. 784; S. v.Evans, 189 N.C. 233. It is suggested that without regard to this principle the wife's statement had no reference to the homicide and was made, if at all, before the commission of the crime. The evidence was competent in that it tended to show the prisoner's possession of the pistol a short while before he came to the farm and called the deceased to the car, for at this time the prisoner had not testified or admitted the homicide.
The deceased was killed about 2 o'clock on Friday; on Monday morning the prisoner surrendered himself to the sheriff of Cumberland County. The State offered evidence to show that search had been made for the prisoner immediately after the death, and thereafter without break until the first of the next week. The purpose was to show flight, and flight is a circumstance to be laid before the jury as having a tendency to prove guilt, although as his Honor correctly instructed the jury, it is not evidence of premeditation or deliberation. S. v. Foster, supra; S. v. Tate,161 N.C. 280. Fruitless search may be shown by laymen as well as by officers of the law.
It is urged for error that his Honor failed to state the evidence in a plain and correct manner and to declare and explain the law arising thereon. C. S., 564. In reference to the first of these clauses it may be said that recapitulation of all the evidence is not demanded and that the requirements of the statute in this respect are met by presentation of the principal features of the evidence relied on respectively by the prosecution and the defense. An omission from the charge of an important feature of the evidence should be called to the attention of the court before the verdict is returned. This opportunity was given the prisoner's counsel, the judge inquiring near the close of the charge whether he had overlooked any of the contentions. Only one was suggested, and it was submitted to the jury. S. v. Grady, 83 N.C. 643; S. v. Pritchett,106 N.C. 667; Boon v. Murphy, 108 N.C. 187; S. v. Ussery,118 N.C. 1177.
Concerning the necessity of declaring and explaining the law it has been held in quite a number of cases that nothing more is required than a clear instruction which applies the law to the evidence and gives the position taken by the respective parties as to the prominent and controlling features which make for the ascertainment of the facts. We adhere to the well settled principle so clearly enunciated in Merrick's *Page 468 case that a judge in his charge to the jury should present every substantial and essential feature of the case embraced within the issue and arising from the evidence; and we would not hesitate to declare any material departure therefrom substantial cause for a new trial. S. v.Merrick, 171 N.C. 788, 795. But we have not discovered in this case any such disregard of the statute as calls for the application of this salutary doctrine.
The seventh and eighth exceptions are so obviously untenable as to require no comment; as to the ninth we find no evidence to which the doctrine of cooling time should have been applied; and in the instruction as to retreating to avoid a menaced encounter we have found no error of which the prisoner can reasonably complain. The eleventh and twelfth exceptions also are without substantial merit. In the recital of the prisoner's contentions the cause he assigned for his conduct after the homicide and for leaving home was clearly stated. If there was error in setting out the contentions which are the subject of the thirteenth, fourteenth and fifteenth exceptions, it should have been pointed out when corrections of this character were requested by the court. S. v. Ashburn,187 N.C. 717; S. v. Reagan, 185 N.C. 710; S. v. Little, 174 N.C. 800.
The exception last to be considered was taken to the court's refusal to withdraw from the jury the question of murder in the first degree. It is argued that there was no evidence of premeditation and deliberation; but we cannot concur. The evidence of self-defense was at least subject to doubt. The prisoner said that when he arrived at the farm the stick with which the deceased assaulted him was "in the car between the back of the front seat and the coat rack." His wife testified: "I did not see the stick any more after the shooting until after I got home. Next time I saw it, it was between the coat rack and the seat, the same place it was before the shooting." This, and evidence of the threat, of the way in which the pistol had been procured, and of circumstances explained by two eye-witnesses, if believed by the jury, formed a sequence of incidents fully warranting the finding that the death of the deceased was the result of a preconceived purpose. S. v. McCormac, 116 N.C. 1036; S. v. Dowden, 118 N.C. 1145; S.v. Daniels, 164 N.C. 464; S. v. Lovelace, 178 N.C. 762.
In reviewing the several assignments of error we have not been inadvertent to the gravity of the judgment. In the interest of human life we have examined the exceptions, the evidence, the instructions, the entire record, and we are unable to see wherein the prisoner has just and legal ground for demanding a new trial.
No error. *Page 469