SEAWELL, J., took no part in the consideration or decision of this case.
Criminal indictment charging defendants with the murder of George Penn.
Verdict: Guilty of murder in the first degree.
Judgment: Death by asphyxiation.
The record on this appeal covers three hundred forty-two pages and contains six hundred and eighty-eight exceptions. Some of the exceptions have been abandoned; the others have been grouped in fifty-two assignments of error. Some of them are formal; others, manifestly untenable, require no further elaboration on well settled principles of law relating thereto. The remainder may be fairly treated in a few groups.
The defendants each pleaded "Not guilty."
On the trial below the State introduced evidence tending to show this narrative: George Penn, a State Highway patrolman, was killed in the late afternoon of Sunday, 22 August, 1937, on the farm and near the barn of Van Patton on Webb Creek in Buncombe County, at the end of a nine or more miles automobile chase of defendants, fugitives from justice as felons under sentence for robbery. The chase began at a truck and bus weighing station, sponsored by the U.S. Bureau of Public Roads and conducted by the State Highway Commission as a unit in a Statewide road life survey. The station was located on U.S. Highway No. 70, about midway between the junction of that highway with U.S. Highway No. 74, which leads to Chimney Rock, and the bridge entrance into the village of Sayles Bleachery opposite the municipal golf course, east of Asheville. All automotive vehicles were being stopped for information. By means of distinctive signs the traffic each way was warned to slow up, stop and "Obey Patrolman." At the place there were a State Highway truck and a State Highway patrol car, distinctively marked, four employees of State Highway Commission, and three State Highway patrolmen, including George Penn — dressed in regulation patrol uniforms. *Page 722 
Two men, later ascertained to be the defendants, approached the station from the west, but, being without driver's license and in a stolen blue Ford sedan automobile, turned in the line of traffic at distance from the station variously described as fifteen feet to two hundred yards, and drove away at a rapid rate of speed in the direction from which they came. Patrolman Penn called out "Halt," three times. Defendants did not stop. Penn set out in pursuit in the patrol car. The chase was over the bridge, into and through the Sayles Bleachery village, up the hill, over the railroad bridge, down to and out the old Fairview-Biltmore road to U.S. Highway No. 74, thence along the highway about six miles toward Chimney Rock, and thence on the Webb Creek dirt road three miles to Van Patton's barn. The Ford and the patrol car were seen traveling at a very high rate of speed, and were heard at several points along the route. The patrol car with siren blowing was close behind the Ford at every point they were seen from bridge entrance to the Bleachery to the barnyard of Van Patton. In the beginning the two men were riding the front seat of the Ford. But near the top of the hill before reaching the railroad bridge one of them was seen crouched down between the front and back seats. As the cars came to U.S. Highway No. 74, the man in the rear seat of the Ford was shooting at the patrol car. Five or six shots were heard.
As the cars approached Van Patton's place, the Ford turned off the main road into the private roadway that leads to and ended at Patton's barn and garage building. It was driven up to the corner of the barn and to the very edge of a field of average growth corn which surrounded the barn. The patrol car stopped fifty yards away. Patton testified that he didn't see the officer get out of the patrol car, but he saw him after he was on the ground. He was dressed in officer's uniform. "Just after I saw him on the ground, I heard a shot. That was the patrol shot. I think he was the first man shot. The others opened on him then . . . and kept it up until I saw him fall. . . . The shots came from right at the barn as near as I could tell. . . . I could not tell how many shots I heard from the barn. They shot so fast. Half a dozen or something more. . . . He (officer) was standing behind his car when he fell. . . ." Then after one of the men had walked down to where the officer lay on the ground, they turned the Ford around and, in attempting to go out by the patrol car, stuck in a ditch. They then used the patrol car to get out. Then they left carrying the officer's pistol with them. The legs of the officer were in the ditch and showed sign of being run over by the car. At the barn four empty 12-gauge shotgun shells and two rifle cartridge shells and clip were found. The clip and cartridge shells were found near a post at the upper side of the barn, at which there were tracks "where men stood" and a "mark on a plank that sticks out by the post that looked as if he had laid his gun *Page 723 
down. Looked as if he used it for a rest. That was in direct line with . . . the officer's body. . . ."
There were bullet holes in the front, the windshield and the top of the patrol car. The men made their escape, but the blue Ford was located that night. There were fresh bullet holes in the trunk on the rear, and a shotgun was in the back seat. Finger prints were taken. Then the hunt began, resulting in the arrest of the defendants at Sanford, North Carolina, on 3 January, 1938. Later defendants, separately, confessed the shooting.
The State, over defendants' objection and for purpose of showing flight, offered testimony of alleged confessions of the defendants and direct testimony as to escapes of the defendants from arrest by officers following the homicide in question up to the time of their arrest. Sheriff Brown testified that Turner admitted that in December, 1937, he and one Bolen Bird engaged in a shooting encounter with State Highway patrolmen in New Hanover County. Patrolman Sloan was permitted to describe the occurrence, a four-mile running chase, in which Turner shot at the officers with a high-powered rifle and pistol, and made his escape. The pistol and rifle were offered in evidence. Other testimony was offered by witnesses to show that on several occasions following the killing of Penn, Payne and Turner evaded arrest. Sheriff Brown testified that Turner stated that he had a boat near Southport for use in case he ran into a "dead end." Further statements of Turner and Payne and of other witnesses were admitted to the effect that Turner and Payne spent some time at a tourist camp at Myrtle Beach, South Carolina, with one Smith, who had escaped with them from State's Prison, but that they left there when Smith shot an officer. The court admitted the evidence solely for the purpose of showing flight and then only against defendant who made the confession. The jury was so instructed.
In criminal cases every circumstance that is calculated to throw any light upon the supposed crime is permissible. S. v. Case, 93 N.C. 546; S.v. Dickerson, 189 N.C. 327, 127 S.E. 256; S. v. Lawrence, 196 N.C. 562,146 S.E. 395.
Flight is competent evidence to be considered by the jury in connection with other circumstances in passing upon the question of guilt. S. v.Malonee, 154 N.C. 200, 69 S.E. 786; S. v. Hairston, 182 N.C. 851,109 S.E. 45; S. v. Stewart, 189 N.C. 340, 127 S.E. 260; S. v. Steele,190 N.C. 506, 130 S.E. 308; S. v. Adams, 191 N.C. 526, 132 S.E. 281; S.v. Mull, 196 N.C. 351, 145 S.E. 677; S. v. Beal, 199 N.C. 278,154 S.E. 604; S. v. Lawrence, supra; S. v. Tate, 161 N.C. 280, 76 S.E. 715.
In S. v. Tate, supra, it is stated: "But such flight or concealment of the accused, while it raised no presumption of law as to guilt, is competent to be considered by the jury in connection with other circumstances." *Page 724 
In S. v. Steele, supra, Varser, J., said: "Subsequent actions, including flight, . . . are competent on the question of guilt."
Flight is not evidence of and may not be admitted to prove premeditation and deliberation. S. v. Foster, 130 N.C. 666, 42 S.E. 284; S. v. Tate,supra; S. v. Westmoreland, 181 N.C. 590, 107 S.E. 438; S. v. Collins,189 N.C. 15, 126 S.E. 98; S. v. Stewart, supra; S. v. Steele, supra; S.v. Graham, 194 N.C. 459, 140 S.E. 26; S. v. Lewis, 209 N.C. 191,183 S.E. 357.
Consequently, the defendants contend that having confessed to the shooting of the deceased, the door is closed to the State to introduce evidence of flight. The record discloses, however, that the identity of the defendants was not definitely known until after their arrest in January, 1938, and then only through the alleged confessions. The only independent testimony was that of the witness Van Patton, who from the witness stand identified Turner as one of those at his barn at the time of the shooting. It is appropriate to remember that on being arraigned the defendants pleaded not guilty.
"The circumscribed admission of the defendants should not be invoked as a means of excluding evidence material to the State's proof of the essential elements of the crime charged in the indictment." S. v. Galloway,188 N.C. 416, 124 S.E. 745.
The present case is distinguishable from the factual situation in S. v.Foster, 130 N.C. 666, 41 S.E. 284.
Defendants contend that the evidence of flight was prejudicial in that it tended to show other offenses against the criminal law. If the evidence were competent for any purpose, it would be error to exclude it. S. v.Goff, 117 N.C. 755, 23 S.E. 355; S. v. Graham, supra; S. v. Galloway,supra.
In S. v. Miller, 189 N.C. 695, 128 S.E. 1, the Court said: "It is undoubtedly the general rule of law with some exceptions that evidence of a distinctly substantive offense is inadmissible to prove another and independent crime, the two being wholly disconnected and in no way related to each other." Citing authorities. Then, continuing — "But to this there is the exception, as well established as the rule itself, that proof of the commission of other like offenses is competent to show the quoanimo, intent, design, guilty knowledge, or scienter where such requirements are so connected with the offenses charged as to throw light upon the question." To like effect are: S. v. Simons, 178 N.C. 679,100 S.E. 239; S. v. Stancill, 178 N.C. 683, 100 S.E. 241; S. v. Crouse,182 N.C. 835, 108 S.E. 911; S. v. Dail, 191 N.C. 231, 131 S.E. 573;S. v. Hardy, 209 N.C. 83, 182 S.E. 831; S. v. Ray, 209 N.C. 772,184 S.E. 836; S. v. Batts, 210 N.C. 659, 188 S.E. 99; S. v. Flowers,211 N.C. 721, 192 S.E. 110; S. v. Smoak, ante, 79, 195 S.E. 72. *Page 725 
We think the evidence of the occurrences in which the defendants made their escapes singular from the State Prison and subsequent evasions of arrest are competent as tending to show the state of mind of the defendants at the time of the killing of George Penn, at the end of a running gun battle in an attempt to escape arrest by him. In their confession the defendants separately admit that they knew that an officer was pursuing them and that they heard the siren on his automobile.
The State, also over objection by defendants, offered testimony tending to show threats: (1) In 1933 or 1934, while in prison, the defendant Turner stated on different occasions "that he did not have any use for any officers at all, . . . if he ever got out and got behind a .45 that it would then be on." (2) About ten days prior to the homicide defendant Turner, with Payne standing near by, stated that "he wanted a driver's license so he would be protected in case he got stopped. He said he was not going to stop and if anybody ever tried to set him in again he would kill them, or any damn law either." (3) On Sunday next before 22 August, 1937, Turner, after stating that "his wife had him set in one time, had him took back," expressed desire to torture her with mosquitoes and then to beat her to death, and, on being asked if he would like to die that way, he said he "wouldn't mind it if he could take a couple of those s. o. b.'s with him."
Evidence of threats are admissible and may be offered as tending to show premeditation and deliberation, and previous express malice, which are necessary to convict of murder in the first degree. S. v. Tate, supra; S.v. Shouse, 166 N.C. 306, 81 S.E. 333; S. v. Graham, supra; S. v.Miller, supra; S. v. Wishon, 198 N.C. 762, 153 S.E. 395; S. v. Casey,201 N.C. 185, 159 S.E. 337.
"General threats to kill not shown to have any reference to deceased are not admissible in evidence, but a threat to kill or injure someone not definitely designated are admissible in evidence where other facts adduced give individuation to it." S. v. Shouse, supra.
"Threats made by a person against one of a class are admissible on a prosecution for committing a crime against another one of the same class." 8 R. C. L., 187; S. v. Ellis, 101 N.C. 765, 7 S.E. 704; S. v. Hunt,128 N.C. 584, 38 S.E. 473; S. v. Burton, 172 N.C. 939, 90 S.E. 561; S.v. Baity, 180 N.C. 722, 105 S.E. 200; S. v. Miller, 197 N.C. 445,149 S.E. 590; S. v. Casey, supra.
The fact that the first alleged threat was made three or four years prior to the homicide does not make such evidence incompetent as a matter of law. As the judge told the jury, the remoteness goes only to the weight of the evidence and not to its competency. 8 R. C. L., 187; S. v. Merrick,172 N.C. 870, 90 S.E. 257.
In S. v. Johnson, 176 N.C. 722, 97 S.E. 14, Brown, J., said: "We might hesitate to admit evidence of threats, made two years before the *Page 726 
homicide, if they stood alone, although threats made twelve months prior were admitted in S. v. Howard, 82 N.C. 624, without evidence of continuing threats. In this case there is evidence of continuing and repeated threats up to six months before the homicide . . .," cited in S.v. Wishon, supra, wherein the Court said: "Evidence of the threat first made is competent at least in corroboration." S. v. McDuffie, 107 N.C. 885,12 S.E. 83.
In the case in hand there is evidence tending to show threats on the very day the homicide took place — showing the state of mind of the defendants with respect to being returned to prison — a fixed determination to resist even unto death.
Testimony was introduced, without objection, tending to show that both Payne and Turner had made statements to the effect that they had rather die than go back to prison; that a few days prior to 22 August, 1937, at a tourist camp near Asheville, Payne said to Turner: "You are going to keep on and get us caught messing around with these women," to which Turner replied that "he didn't give much of a damn because he was not going back to Caledonia (prison) anyway because it was a `living hell'"; and that on the morning of 22 August, 1937, the witness Estelle Miller told defendants "that they had better quit messing around here, . . . that they would get us in trouble and get in trouble, too, and Bill said that was right, that he had tried to get Jack (Turner) to quit messing around here so much and Jack said he didn't care, that he would never be took back alive nohow, to where he came from — he hated to kill anybody but he would before he would be took back; he would rather die as to go back."
The State also offered in evidence each article taken from the automobile in which the defendants were riding at the time of their arrest on 3 January, 1938, in Sanford, North Carolina, including pistols, automatic shotgun, pistol holster, many pistol bullets, shotgun shells, loaded with buckshot, crowbar, sledge hammers, bolt cutter, breast drill, brace and bit, claw hammers, screwdrivers, wrenches, steel chisel, cold chisel, steel punch, files, hack saw, cushion, green and pink blankets, quilts, odd gloves, flashlight and personal effects of the defendants. Objections thereto cover nearly two hundred exceptions. Counsel for defendants complain that these articles were introduced item by item and displayed on tables in the presence of the jury to the great prejudice of defendants. In the case of S. v. Fogleman, 204 N.C. 401, 168 S.E. 536, speaking to the subject, Adams, J., said: "The exceptions are without merit. Evidence of this character is admissible on the principle that it tends to show a design and plan. The existence of such design or plan may be proved circumstantially as well as by direct utterance. . . . If the gun, the shells and the several implements in the prisoners' car *Page 727 
had been discovered immediately after the homicide, evidence of the fact would unquestionably have been competent." In the present case the remoteness from the date of the crime does not impair the competency of the evidence, the probative force of which was a matter for the consideration of the jury.
Defendants insist that the court erred in that part of the charge in which defendants' plea of self-defense was submitted to the jury. Under the evidence presented on this appeal, it is clear that the plea is not well taken and the court could very properly have refused to submit it to the jury.
"When a man puts himself in a state of resistance, and openly defies the officers of the law, he is not allowed to take advantage of his own wrong, if his life is thereby endangered, and to set up the excuse of self-defense." S. v. Garrett, 60 N.C. 148; S. v. Horner, 139 N.C. 603,52 S.E. 63; S. v. Durham, 141 N.C. 741, 53 S.E. 720; S. v. McClure,166 N.C. 321, 81 S.E. 458; S. v. Miller, supra.
In S. v. Horner, supra, the Court said: "He (defendant) admits the homicide with a deadly weapon, thereby taking upon himself the burden of showing that he was acting in self-defense. The deceased was acting strictly in the line of his duty in endeavoring to make the arrest and the prisoner was, upon his own showing, avoiding if not resisting arrest. The principle governing the case is thus stated in S. v. Garrett, . . . quoted as above . . . The application of this principle to prisoner's testimony sustains his Honor in saying to the jury that he was guilty of manslaughter at the least. . . . The prisoner knew that deceased was a deputy sheriff and that he had a warrant for his arrest. It was his duty to submit to arrest, and in resisting it, with a gun in his hand, it is not open to him to say that he acted in self-defense. Conceding that, as he was going away from the officer, refusing to submit to arrest, the officer was not justified in shooting him to make the arrest, does not affect his right to kill. If there was a necessity to shoot the deceased to save his life, it was the result of his unlawful act in resisting the mandate of the law. The position of the prisoner is similar in this respect to one who brings on or provokes a difficulty, and in the progress of it kills. It is not sedefendo because he brought on the necessity. . . . The power and right of the officer in making arrests . . . is not the test of the prisoner's guilt. It may be that the prisoner was right in saying that both acted hastily, but he was in the wrong in refusing to submit to arrest, and the law fixes the responsibility for the homicide upon him. If the killing is of malice, it is murder; if premeditated, it is murder in the first degree — in no aspect is in self-defense." *Page 728 
To the same effect is S. v. Durham, supra. It is there said: "In this State we have a statute (Laws 1889, ch. 51) which enacts that `any person who willfully and unlawfully resists, delays or obstructs a public officer in discharging or attempting to discharge a duty of his office shall be guilty of a misdemeanor.' (C. S., 4378.) At the time he killed the deceased the defendant was engaged in an unlawful act, not only malum in se (being in armed resistance to the process of the State), but an act directly connected with and which finally resulted in the death of the officer; for it is plain that had the defendant himself not resisted the law but submitted to arrest, there would have been no homicide by anyone."
In S. v. McClure, supra, the Court said: "The assault upon the deceased (officer) was not an offense against the individual, but one against the public, for this reason the authorities generally support the position that it is the right of peace officer to arrest, without warrant, one who assaults him . . . and the officer did not lose the right in this case because the prisoner had walked off, according to the evidence of one witness, thirty or forty feet, and to that of another fifty to seventy-five yards."
In the present case it is clear that Patrolman George Penn, the deceased, was acting in the line and discharge of his duty and within his rights as an officer in attempting to arrest the defendants. He had the right to arrest without a warrant. But be that as it may, the defendants were in open defiance of the law. They admit, in their confession, that they knew the deceased was an officer; that they heard the siren on his automobile; that they turned in line of traffic in the face of the warning to drive slow, stop, and "Obey Patrolman"; that one of the defendants shot at deceased in the chase; that they were riding in a stolen automobile, and had no license to operate it. C. S., 2621 (151), (e), (g). Also, their refusal to obey the siren and stop, C. S., 2621 (62), (a), constituted a continuing offense in defiance of the law. The evidence also shows them to be escaped felons and that, in escaping from prison, they forcibly took and carried away the superintendent and other persons, which in law is a felony. On the facts presented on this record, the plea of self-defense is not open to them.
It is pertinent to note that "any citizen of North Carolina shall have authority to apprehend any convict who may escape before the expiration of his term of imprisonment, whether he be guilty of a felony or misdemeanor, and retain him in custody and deliver him to the director of prisons." Public Laws 1933, ch. 172, sec. 21; C. S., 7748 (q).
Murder in the first degree is the unlawful killing of human being with malice and with premeditation and deliberation. C. S., 4200; S. v. Thomas,118 N.C. 1113, 24 S.E. 535; S. v. Benson, 183 N.C. 795,111 S.E. 869; S. v. Steele, supra. *Page 729 
The intentional killing of a human being with a deadly weapon implies malice and, if nothing else appears, constitutes murder in the second degree. S. v. Terrell, 212 N.C. 145, 193 S.E. 161; S. v. Robinson,ante, 273, 195 S.E. 824; S. v. Mosley, ante, 304, 195 S.E. 830.
"The additional elements of premeditation and deliberation, necessary to constitute murder in the first degree, are not presumed from a killing with a deadly weapon. They must be established beyond a reasonable doubt, and found by the jury, before a verdict of murder in the first degree can be rendered against the prisoner." S. v. Miller, supra.
"Premeditation means `thought beforehand' for some length of time, however short." S. v. McClure, supra; S. v. Benson, supra; S. v. Steele,supra.
"Deliberation means that the act is done in cool state of blood. It does not mean brooding over it or reflecting upon it for a week, a day or an hour, or any other appreciable length of time, but it means an intention to kill, executed by the defendant in a cool state of blood, in furtherance of a fixed design to gratify a feeling of revenge, or to accomplish some unlawful purpose, and not under the influence of a violent passion, suddenly aroused by some lawful or just cause or legal provocation." S. v.Benson, supra; S. v. Steele, supra.
Tested by these well settled principles, the evidence presented on the case in hand is sufficient to be submitted to the jury, and to sustain the verdict. In addition to evidence of threats against officers, of a declared purpose to resist arrest at the risk of their own lives, of their preparation, of their ruthless conduct, of their defiance of law, and other evidence bearing on the question, the defendant Payne, on being asked after his arrest why he shot Officer Penn, said: "He had it coming to him, he was a damned fool."
We have carefully examined all other exceptions and find no reversible error. Even if there be technical error in some of the rulings and in the course of the trial, this alone would not work a new trial. "We are convinced, from a searching scrutiny of all that transpired on the hearing, to which exceptions have been taken, that substantial justice has been done."
In the judgment below we find
No error.
SEAWELL, J., took no part in the consideration or decision of this case. *Page 730